# Richmond

## Carroll W. Hinton v. J. A. Gallagher.

January 16, 1950.

Record No. 3544.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*R. O. Norris, Jr.* and *W. Victor Richardson,* for the plaintiff in error.

*Dabney Overton, Ammon G. Dunton* and *Wm. B. McLeod,* for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

J. A. Gallagher, in an action against Carroll W. Hinton, obtained a verdict and judgment for $5,000 for personal injuries, medical expense, and property damage, resulting from a collision between two trucks, driven by the respective parties. From that judgment Hinton obtained this writ of error.

The plaintiff in error contends that the trial court committed reversible error in its refusal to set aside the verdict

of the jury, on two grounds: (1) the evidence was insufficient to support the verdict, and (2) the misconduct of one of the jurors.

While there is a sharp conflict in the evidence, under the familiar and well established rule, we must consider it in the light most favorable to the successful litigant in the trial court. Guided by this rule, the evidence may be stated as follows:

On September 26, 1946, Gallagher was driving a 1946 model Ford pick-up truck west on Route 360 from Warsaw toward Richmond, with his son, Marion Gallagher, and James E. Packett riding in the cab with him. Carroll W. Hinton, with a colored boy, Randolph Rice, riding in his cab, was driving a one and a half ton 1941 model Chevrolet truck, on the same highway in an easterly direction. At the same time Mrs. Wesley Broach was walking eastwardly on the hard surface approximately two feet from the right shoulder of the same highway, pushing a baby carriage with her ten month's old baby therein. Her four-year old boy was walking on the hard surface to her left.

The weather was clear, the midday sun shining brightly. The hard surface of the road was twenty feet wide, the shoulder on the north approximately four feet wide and the one on the south approximately eight feet wide.

Carroll W. Hinton, traveling thirty or thirty-five miles per hour in an easterly direction (approaching from behind Mrs. Broach), turned to his left across the center of the highway in order to pass Mrs. Broach and the baby carriage. After he had passed them he did not seasonably turn back into the right-hand traffic lane, but continued on his left side of the highway.

J. A. Gallagher, traveling at forty or forty-five miles per hour in a westerly direction, saw the Hinton truck as it turned to pass Mrs. Broach. When Hinton's truck did not turn back to its side of the highway, he first applied his brakes, and as the Hinton truck continued to approach him at undiminished speed, on the wrong side of the highway,

Gallagher, in an effort to avoid a head-on collision, cut his truck to the left, and at the same time Hinton to his side of the highway. As a result of these movements the trucks collided almost head-on the extreme south side of the highway.

When the trucks came to rest the right front and rear wheels of the Hinton truck, and the left front and rear wheels of the Gallagher truck were off the hard surface on the south shoulder of the highway. The force of the impact knocked the Gallagher truck back one or one and a half feet.

Neither of the two parties riding in the Hinton truck was injured, but each of the three riding in the Gallagher truck was seriously injured; James E. Packett died. Gallagher was confined in the hospital six weeks, suffering from several broken bones and other permanent injuries. The Ford truck was completely demolished. The salvage value was stated to be only $150.

The trial court gave twenty-four instructions, to which there was no objection. They thus became the law of the case.

The crucial issue is whether the alleged negligence of Hinton in continuing to drive on the wrong side of the road after he passed Mrs. Broach, created a situation so perilous that it gave Gallagher the right to invoke the doctrine of sudden emergency.

As heretofore stated, the evidence on this issue is in sharp conflict. The defendant's evidence tends to prove that when Mrs. Broach saw the two trucks approaching from the opposite direction, her four-year old boy went in the ditch on the south side of the highway, and she pushed the baby carriage off the hard surface onto the south shoulder and stopped. Hinton, Rice and Mrs. Broach testified that when Hinton's truck passed Mrs. Broach, it turned slightly to the left, but that no part of the truck crossed the center line of the highway, and that it continued east in the proper traffic lane. The Gallagher truck approached, traveling fast

and without apparent reason, swerved south to its left, across the center of the highway into the east-bound traffic lane, where the collision occurred on Hinton's side of the highway.

The jury had the right to accept or reject the testimony of these witnesses. Since they rejected defendant's evidence, it becomes our duty to examine the other evidence in the record to determine whether it is sufficient to support the verdict.

Mrs. Broach and Rice were impeached by the testimony of J. S. Garthright, a state police officer, who arrived on the scene within thirty minutes after the collision. He testified that on this occasion he talked to both Mrs. Broach and Rice. Mrs. Broach told him that the Hinton truck went over the center of the highway when it passed her and that Rice told him "the truck went completely over the center of the highway forty to fifty yards to the scene of the accident." Parts of Hinton's testimony raise serious doubt as to the care exercised by him, or the accuracy of his statements. He said that when his truck, which was 89 inches wide, passed Mrs. Broach, she was standing on the shoulder, and that the right side of the truck passed "a foot from her." Ordinarly a motor vehicle traveling 35 or 40 miles an hour should not be driven that close to a pedestrian, even if such pedestrian is standing on the hard surface. It certainly should not be driven that close to a woman standing by or behind a baby carriage on the shoulder.

Other testimony tends to prove that as plaintiff came over the knoll he saw the defendant turning to his left to pass a woman pushing a baby carriage at a point on the highway estimated to be 450 feet away. The Hinton truck, after passing the pedestrians, did not turn back to its right, but continued at an undiminished speed in the west-bound traffic lane. Plaintiff first applied his brakes. He then looked to his right and saw a narrow shoulder (approximately 4 feet wide) covered with honeysuckle, a ditch, and a culvert, a short distance ahead. He looked to his left and saw beyond

the hard surface a wide shoulder (8 feet), and an open field. It was apparent to him that if the vehicles continued in the course they were traveling a head-on collision was inevitable. When the trucks were from 100 to 115 feet apart, plaintiff stated that he released his brakes and turned sharply to his left for the purpose of crossing the left-hand traffic lane into the open field beyond the shoulder, and apparently at the same time the driver of the Hinton truck saw him and realized that he was driving in the wrong lane and cut back to his right.

Marion J. Gallagher, who was riding in the cab with his father, testified that as the truck came over the knoll he saw the Hinton truck approximately 450 feet away pulling around the baby carriage, and that the truck did not return to its proper lane. When the trucks got so close together that he realized a collision was inevitable he put his hands over his eyes, immediately after which he felt his father's truck swerve to the left. He estimated that the Hinton truck traveled approximately 150 feet after it passed the baby carriage to the point of collision.

Garthright testified that from the top of the knoll over which the plaintiff was traveling, to the point of the impact, was approximately 207 feet; that there was a faint skid mark, apparently made by the Gallagher truck, beginning on the north side of the hard surface 159 feet from the top of the hill, and extending to approximately the center of the highway. The distance from the beginning of the skid mark to the point of impact was 48 feet.

Defendant contends that the mark in the highway proved conclusively that Gallagher's brakes were on at the time that he began the left turn. This may be true, but even if Gallagher did not release his brakes the moment he began to make the turn, it does not necessarily follow that he was negligent.

When the trucks were 450 feet apart they were traveling at a speed of approximately 45 and 35 miles an hour, respectively—that is, they were closing a gap between them

at approximately 119 feet a second. Hence it would have taken only 3¾ seconds for them to meet. If Gallagher was traveling on his right side of the highway, as he said he was, he was under no duty to change his course until it appeared to him that the driver of the vehicle approaching him did not intend, after passing the pedestrian, to return to his traffic lane. In other words, the driver of a motor vehicle has a right to assume that the driver of another motor vehicle approaching him from the opposite direction, will obey the law and drive to his right side of the highway. The evidence clearly shows that it was only necessary for Hinton to make a slight left turn to pass Mrs. Broach and the baby carriage, and that there was no traffic to interfere with or prevent him from turning back into the east-bound traffic lane in plenty of time to have met and passed Gallagher in safety.

The evidence for Gallagher tends to support his contention that the negligence of Hinton in driving on the wrong side of the highway forced him to decide within three seconds which of three courses he would pursue (1) turn his truck to the right on a narrow shoulder into a ditch, and probably wreck it against the culvert (2) apply his emergency brakes and stop, with the probability of being struck head-on, or (3) turn to the left across the east-bound traffic lane on the eight foot shoulder and thus avoid a collision with the truck which was bearing down upon him. This left turn may not have been, and as it developed, was not, the wisest course to pursue.

This court, speaking through Judge Chinn, and discussing a similar situation, in *Lavenstein* v. *Maile*, 146 Va. 789, 799, 132 S. E. 844, said: "* * * an automobile driver, who by the negligence of another, and not by his own negligence, is suddenly confronted by an emergency and is compelled to act instantly to avoid an accident or injury, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice; and whether he used

reasonable care under the circumstances is ordinarily a question for the jury."

The general rule is that the operator of a motor vehicle is not necessarily guilty of contributory negligence, as a matter of law, when he turns to the left in violation of the law of the road, in an attempt to avoid another vehicle, approaching from the opposite direction on the wrong side with which a collision is threatened. But whether contributory negligence exists depends upon the facts and circumstances of the particular case. See Annotations, 24 A. L. R. 1304; 63 A. L. R. 277, and 113 A. L. R. 1328.

The evidence for the respective parties presents three primary issues (1) did a sudden emergency actually exist; (2) was the defendant guilty of negligence; (3) was the plaintiff guilty of contributory negligence. These issues were submitted to the jury on elaborate instructions, to which there was no objection. Under these circumstances the finding of the jury is conclusive.

The other question presented is whether the trial court erred in its refusal to set aside the verdict on the ground of the misconduct of one of the jurors.

The facts upon which defendant's contention is based are: While the judge and the attorneys were in chambers discussing the instructions, the sheriff saw Charles Loving, a juror, reading a typewritten document that had been left on the table in the court room. When the sheriff told him that it was improper for him to read this document, he immediately stopped and put it back on the table. The document was part of the reporter's transcript taken in another trial involving the same accident. It contained that part of Garthright's testimony offered in rebuttal in the former trial, and, by consent of the parties, had been read to the jury in the present case. It also contained the testimony of M. T. Holden a witness introduced in the former trial, but not introduced in the case then pending, and a lengthy discussion between counsel and the judge who presided in the former case.

The fact that the juror had picked up the document and read a part of it, was known to the lawyers representing the plaintiff and defendant the day before the case was submitted to the jury, yet no motion was made to declare a mistrial or other ruling of the court requested until after the jury's verdict had been accepted and they had been discharged.

The general rule is that a party will not be permitted, after discovering an act of misconduct which might entitle him to a new trial, to remain silent, take his chance on a favorable verdict, and when disappointed, rely upon such misconduct as a ground for a new trial. A party will not be permitted to gamble upon the result and complain only when the verdict is adverse to him. *Jones* v. *Martinsville*, 111 Va. 103, 68 S. E. 265, Ann. Cas. 1912A, 222.

Defendant admits that the foregoing is the general rule, but contends that it does not apply in this case because neither he nor his counsel knew, or had means of knowing, how much of the document had been read by the juror, and whether he communicated any of the statements therein to other members of the jury until after the verdict had been rendered and the jury had been discharged.

This contention is unsound. Counsel for both parties knew the day before the case was submitted to the jury that the juror had examined the document in question. The extent of the examination was unknown. The trial court, on request, could, without prejudice, and in the presence of the interested parties, have asked the juror how much of the document he had read, and whether he had made any comment thereon, or discussed it with the other members of the jury. Having failed either to move for a mistrial or to request the court to examine the jurors on the subject, defendant waived his right to take advantage of the alleged misconduct. This rule was not relaxed, as defendant contends, in *Crockett* v. *Commonwealth*, 187 Va. 687, 47 S. E. (2d) 377, for, in that case, we said: "* * * a party litigant should not await the return of the verdict and have a chance of securing a favorable one, and then, if unfavorable, make

a motion for a new trial. When such delay is indulged in, it is usually considered a waiver of his rights."

However, the trial court did not, as it might well have done, base its refusal to set aside the verdict on the ground of waiver, but permitted the parties to introduce evidence on the issue—whether examination of the document by the juror was prejudicial to defendant.

 One essential concept of a fair trial is that no outside influence shall be brought to bear upon the jury, and that no evidence shall be considered by them other than that presented and admitted on the trial of the case. The reading by a juror of a document that is not properly introduced in evidence is a ground for mistrial, if there is sufficient ground to believe that one of the parties in a civil action, or the accused in a criminal case, has been prejudiced thereby. See Annotation 20 A. L. R. 1202; 67 A. L. R. 1531; 39 Am. Jur., New Trial, sec. 73, p. 93.

The first four printed pages of the document contained the rebuttal testimony of Garthright which had been read to the jury. It is not contended that the reading of this part was prejudicial to either party. That part of Holden's testimony which disclosed that he was an agent for the insurance company carrying collision insurance on the Gallagher truck was not prejudicial to Hinton, but that part of his testimony which contradicted Hinton's testimony to the effect that Hinton had told him that, in passing Mrs. Broach, he had driven his truck approximately two feet to the left of the center of the highway was prejudicial.

The overwhelming weight of the testimony introduced on the issue now under consideration shows that the juror did not read the part of the document containing any of Holden's testimony.

Affidavits and testimony of six of the seven jurors, four of the attorneys representing the parties to this litigation, the sheriff, and two attorneys who were not directly interested in the case, were considered by the trial court. Five of the jurors, the sheriff, and F. V. Watkins, one of the

disinterested attorneys, corroborated, in whole or in part, the testimony of Charles Loving, the juror, who examined the document. Loving's testimony was to the effect that he did not recall exactly how long he had the document in his hands. He said: "I read the statement of the State Trooper, was reading it, and the Sheriff came over to me and says 'Mr. Watkins says you shouldn't read that' and I said to the Sheriff, 'Well, I haven't read anything in it that hasn't been read to the jury,' and dropped the book on the desk."

This juror was positive in his testimony to the effect that he did not read anything in the document except a part of the testimony of Garthright (the State trooper), and that he made no comments on that part that he did read to any of the other jurors.

The sheriff said that when he warned Loving not to read the document, Loving said to him "what difference does it make, they have been reading it to us anyway." Watkins said that in a talk that he had with Loving after the incident, Loving said "all of it had been read to the jury."

Four of the seven jurors testified that as they remembered the incident, Loving had had the document in his hands only two or three minutes before the sheriff cautioned him about it. George Yerby, the fifth juror, testified that he did not see Loving examine the document and that Loving made no comment on it to him, or in his presence to other members of the jury. The sixth juror was absent from the county and he was not introduced as a witness on this issue.

Walter Randall, the foreman of the jury, was the only witness who testified to the contrary. He said, in effect, that he saw juror Loving, pick up the transcript and read it for from twenty to thirty minutes, that he read parts of it to the jury and made numerous comments thereon. But the juror could not recall what comments Loving made, nor could he recall the contents of the document itself.

The trial court asked the witness this question:

"Q. Mr. Randall, I wish to say what I am trying to get at is what is actually right and what is the truth about this

man. Loving has made an affidavit here that he did not read anything but Gathright's testimony in that transcript. I want to know from you whether or not you know that statement is a correct statement or is not a correct statement, and if so, tell me why?

"A. That is a difficult question to answer, I was not following him when he read the book, but when the sheriff took the book from Loving he said, it is too late now I have seen it all. The impression was that he had read all that was in it."

This court has held that, whether a new trial should be granted on the ground of the misconduct of a juror, depends upon the facts and circumstances of each particular case. "Much should be left to the trial judge, and unless he abuses his discretion, his judgment should conclude the matter on appeal." *Litz* v. *Harman*, 151 Va. 363, 144 S. E. 477.

In *Hickerson* v. *Burner*, 186 Va. 66, 41 S. E. (2d) 451, Justice Eggleston, speaking for the court, said: "We adhere to that view with the added caution that only slight evidence of influence or prejudice as a result of such misconduct of a juror should be required to warrant the granting of a new trial."

In view of juror Loving's emphatic statement to the effect that the only part of the document that he read was the rebuttal testimony of Garthright; the positive testimony of four of his fellow jurors to the effect that he made no comment to them, or to any one in their presence, about anything that he had read, and the corroborating circumstances related by the sheriff and F. V. Watkins, a disinterested attorney, we cannot say that the trial court abused its discretion in overruling the motion to set aside the verdict.

The judgment of the trial court is

*Affirmed.*