Mary Josephine Rose and Rita Krilcic, Plaintiffs-Appellees, v. B. L. Cartage Company, Defendant-Appellant.

Gen. No. 51,561.

First District, First Division.

May 19, 1969.

Hinshaw, Culbertson, Moelmamm & Hoban, of Chicago (Perry L. Fuller, D. Kendall Griffith, and Thomas M. Crisham, of counsel), for appellant.

James A. Dooley, of Chicago, for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action in which plaintiffs (sisters) seek to recover damages for injuries suffered in an intersectional collision in 1954 between an automobile in which they were riding and defendant's truck.

A trial in 1961 resulted in a jury verdict for defendant, following which a new trial was granted. A second trial in November 1965 resulted in jury verdicts and judgments in favor of plaintiffs—$100,000 for plaintiff Rose and $20,000 for plaintiff Krilcic. Defendant appeals from both judgments. Defendant does not contest plaintiffs' injuries.

On appeal, defendant contends: (1) that it was error to deny defendant's motion for a directed verdict and judgment notwithstanding the verdict; (2) the verdicts of the jury were against the manifest weight of the evidence; (3) the trial court committed prejudicial trial errors in (a) refusing certain impeachment evidence, (b) injecting itself into the case, (c) allowing plaintiffs to cross-examine their own witness, and (d) admitting certain evidence; (4) the plaintiffs' attorney was guilty of misconduct; (5) the jury was improperly instructed; and (6) the deliberations of the jury were subjected to interference.

The collision occurred at approximately 7:00 p. m. on January 29, 1954, at the intersection of Cicero Avenue and 115th Street, Cook County, Illinois. Plaintiffs' automobile was operated by plaintiff Rose and the tractor-trailer unit, which belonged to defendant, B. L. Cartage Company, was operated by John Poulos. Cicero Avenue was a 4-lane highway running north and south; 115th Street was a 2-lane highway running east and west. Traffic on 115th Street was controlled by stop signs. There was a guardrail parallel to Cicero Avenue on the west side of Cicero, south of 115th Street. West of the guardrail was a gully with water in it, with a culvert south of 115th Street.

The occurrence witnesses included the two plaintiffs, John Poulos (the truck driver), and Bruce Meyers, a motorist who was driving west on 115th Street and entered Cicero from the east.

Plaintiff Rose testified that she was driving a two-tone gray and white Chevrolet east on 115th Street and approached Cicero from the west. She knew there was a stop sign which required eastbound traffic to stop and yield the right-of-way to traffic on Cicero, and that Cicero traffic was not required to stop at 115th Street. She stopped about 10 feet from the west edge of Cicero Avenue, and the right front door of her car was opposite the stop sign. She did not know how far from the west edge of Cicero the stop sign was located, but it was at least 20 feet. Her last recollection was of slowing down and stopping. After being stopped for seconds, her next recollection was coming to in the hospital.

Plaintiff Krilcic testified that when their car stopped the front of the car was about 10 feet from the west edge of Cicero. While in that position she saw headlights of a westbound car on the opposite side of Cicero coming from the east to the west. While the Chevrolet was stopped she was in a sideways position and heard Rose say, "Oh, no." Krilcic then looked ahead and saw what looked like a black wall with red lights across the top coming toward them—"The next thing I recall is coming to in the car. I was on my knees with the steering wheel at the back of my head. . . . While I was in the car I saw my sister on the street. On 115th. She was close to the car." Krilcic could not determine if the object coming toward them was moving straight west, but later stated that it was moving southwest. She also said she was looking straight ahead, which would be east, and her impression was "that this black wall was coming directly toward me to the west. I don't know where it came from."

John Poulos, the truck driver, testified he was traveling south on Cicero Avenue. After stopping for a red light at 111th Street he continued south in the right-hand lane. The highest speed he reached was 25 to

30 miles an hour. He was aware of 115th Street and knew that its traffic had stop signs. When approximately a block away from 115th Street, he saw a vehicle's headlights a block to the west on 115th, and he also saw traffic approaching the intersection from the east. The traffic from the east stopped and proceeded forward into Cicero. One car turned north and one turned south on Cicero. Weeds and debris on the west side of Cicero obstructed his view of eastbound traffic on 115th Street. The marker lights of the truck were on, and he thought that the lower beams of the headlights were on. The truck's right wheels were about 10 inches from the west edge of Cicero as he approached the intersection. The trailer overhangs the wheels approximately two inches.

While approaching the intersection, Poulos' line of travel was the "extreme outside lane," and he did not veer off Cicero at any time before reaching 115th Street. He was looking straight ahead and was watching the car from the east, which was turning south on Cicero, because "I was concerned about that particular automobile drifting into my lane of travel. . . . I was watching the car at the time of the impact." He never saw anything to his right. At the time of the collision, the front of the truck was at the south edge of 115th Street and the impact was to the right and rear of where he was sitting.

Bruce Meyers, a witness for defendant, testified that he was driving an automobile west on 115th Street. As he approached Cicero he observed an eastbound vehicle on the other side of Cicero which was traveling slowly as it approached the intersection. He said: "I noticed that it was going very slowly. It was going slower than I was. I would say that it would have to have been less from the intersection than one hundred feet if my estimate of ten to fifteen miles per hour is correct." Meyers stopped in response to the Cicero stop sign and saw a southbound truck on Cicero 200 to 300 feet north of the intersection. The truck's headlights were illuminat-

266

ed. He observed no northbound traffic so he pulled out on Cicero, heading north. As he was northbound on Cicero, the truck passed him, going south, and at the same time he heard an impact. He looked around and saw sparks underneath the truck, approximately at the right rear drive wheels. At the time he saw the sparks the truck was southbound on Cicero Avenue, but immediately thereafter it "veer[ed] off to the right into a creek just south of there." The truck was traveling 30 to 40 miles per hour, and he did not notice anything unusual about the speed of the truck when he saw it approaching.

Bruce Meyers stopped his car and on foot returned to the scene of the occurrence. He found the Chevrolet facing south off Cicero Avenue with about two feet between the east side of the Chevrolet and the west edge of Cicero. The tractor was 40 to 50 feet west of Cicero facing west-northwest. He saw someone lying on the pavement at about the center of the southbound lanes of Cicero Avenue, 15 feet from the west curb and 5 to 10 feet north of the door of the automobile. "The car was located just south of the intersection, very close to the curb of Cicero Avenue, southbound. It was facing south. It would appear that it was parked very close to the curb."

Neither Rose nor Poulos had any recollection of the position of the vehicles after the occurrence. Poulos testified: "With reference to the impact and the last thing I recall, this car was turning south on Cicero Avenue. That is the last thing I recall." Plaintiff Krilcic did not know of her own knowledge the position of the Chevrolet after the occurrence. Any impression she had concerning its location came from something she had heard from others.

Plaintiffs' witness, James Lindsay, a former State policeman who arrived at 115th and Cicero about 7:15 p. m., testified that the right front of plaintiffs' Chevro-

let was against a post which was part of the guardrail running adjacent to the apron of the intersection. The Chevrolet was pointing south-southwest and no part of it was on Cicero Avenue. The car's left rear wheel was on the apron, which is a portion of the concrete built into the four corners of the intersection to facilitate right-turning. The truck was down in the gully, about 150 feet south of 115th Street and about 50 feet west of Cicero. The front end of the truck was possibly 25 feet south and west of the culvert. About 30 or 35 feet of the guardrail along Cicero was broken. He found Mrs. Rose lying on the apron on the southwest corner west of Cicero Avenue and just outside the automobile. Mrs. Krilcic was in the car lying on the front seat floor.

Lindsay stated the windshield of the Chevrolet was broken on both sides. There was slight damage to the right fender and headlight and the left rear fender was caved in. There were some dents in the upper portion of the saddle tank of the truck, which was located just behind the cab of the truck and straddled the frame. There was no damage to the right front fender, bumper or running board of the truck. Lindsay looked for debris around the area to fix a point of impact but found no debris, broken glass or skid marks. He testified: "I did not find any physical evidence upon which I reached any conclusion as to the point of impact. We drew a point on the report where the outside lane of Cicero would be, crossing the south or eastbound lane of 115th. And I indicated that on my report."

A post-collision witness called by plaintiffs was Paul Wolff, who was the manager of defendant at the time of the occurrence and in a retired status at the time of the trial. When he arrived at the scene, the Chevrolet and the tractor had been removed, but the trailer unit was still there. The trailer was facing southwest approximately 100 to 200 feet south of 115th Street and 20 to 30

feet west of Cicero toward the north side of the culvert, with its rear end near Cicero. The trailer was approximately 20 feet long. The only damage to the right side of the tractor was to the right saddle tank which was loose, so that one end of it had dropped down. There was gray paint on indentations, and no evidence of any marks, paint or scratches on the right bumper, fender or running board. There was damage to the left side of the tractor, including the headlight, fender and running board.

A post-collision witness of defendant was Robert Arnold, who had gone to the scene of the occurrence in a tow truck in response to a call. When Arnold arrived, the Chevrolet was in the west southbound lane of Cicero, just south of 115th Street, facing south. The tractor-trailer unit was on top of the culvert south of the intersection and west of Cicero Avenue. The rear of the trailer was on the highway, pointing northeast. The tractor was facing northwest suspended above the slough with its right rear wheel on the culvert. He saw a lady lying on the west lane of Cicero along the east side of the automobile which was parked in the outer lane.

Initially considered is defendant's contention that it was error for the trial court to deny defendant's motions for a directed verdict and for judgment notwithstanding the verdict, because all the evidence, viewed in its aspect most favorable to plaintiffs, so overwhelmingly favored defendant that no contrary verdict based on that evidence could ever stand. Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 510, 229 NE2d 504 (1967).

In sum, defendant basically contends that the damage to the vehicles and the position of the vehicles after the collision proved conclusively that the Chevrolet was driven into the side of the truck. Defendant asserts there was no testimony that the truck veered in a

269

southwesterly direction from Cicero Avenue before the occurrence. Rose never saw the truck, and Krilcic saw what appeared to be a black wall in front of their car.

Defendant argues that "the plaintiffs' testimony that they were stopped at least ten feet west of Cicero Avenue when the accident occurred is inherently improbable. Plaintiffs' car could not have sustained the type of damage it did under those circumstances. The truck could not have struck the car in that location and then have passed east of the north end of the guardrail as it did. Even in the absence of contradictory evidence a court is not required to accept inherently improbable evidence. Tepper v. Campo, 398 Ill 496, 504-505, 76 NE2d 490, and Michaels v. Midwest Emery Freight Lines, Inc., 81 Ill App2d 277, 280, 225 NE2d 405. In this case two witnesses testified that the truck was on Cicero Avenue at the time of the impact. The plaintiffs' contention that the truck left Cicero Avenue is supported only by speculation, imagination and conjecture, which are an insufficient base for liability. Plaintiffs allege the truck left Cicero Avenue. They must prove it."

The post-collision physical facts outlined by the defendant are persuasive, but the evidence which must be considered on this contention includes plaintiffs' testimony that their automobile was stopped west of Cicero and did not enter that thoroughfare at any time prior to the impact.

Defendant's driver Poulos said there were two cars from the east which stopped and entered Cicero from the east. One car turned north and the other turned south on Cicero. Poulos was watching the car which had turned south on Cicero. He was concerned about it drifting into his lane of travel, which was the outside lane. He could not move to the left without colliding with the car making the left-hand turn. He said that at the time of the impact he was "looking ahead of me" and was paying atten-

tion to that particular vehicle as he crossed the intersection, and he never saw anything to his right. It should be noted here that Meyers testified his was the only vehicle on 115th Street approaching Cicero from the east. He saw no one make a left turn. Meyers saw the Rose car on 115th Street, coming from the west, and noticed that it was traveling very slowly (10 to 15 miles per hour) as it approached Cicero, and it reached the intersection after he did. As he approached Cicero he dimmed his lights and plaintiffs' car did likewise.

■ Considering all of the evidence in this case, viewed in its aspect most favorable to plaintiffs, we are not persuaded that plaintiffs' testimony is inherently improbable or that the evidence so overwhelmingly favors defendant that "no contrary verdict based on that evidence could ever stand." (37 Ill2d 494, 510, 229 NE 2d 504.) We find no error in the court's denial of defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

■ Next considered is defendant's contention that the verdict of the jury was against the manifest weight of the evidence. We believe the principles to be applied here, in the absence of prejudicial trial errors, are set forth in Schneiderman v. Interstate Transit Lines, Inc., 331 Ill App 143, 147, 72 NE2d 705 (1947):

> " 'There are many things which a jury observes on the trial in such case that do not appear from the printed record—the appearance of the respective witnesses, their manner of testifying and a great many other circumstances. They are in a much better position in such case to determine the truth of the matter in controversy than a court of review.' . . . Under the law we cannot disturb the verdict of the jury unless it is clearly against the manifest weight of the evidence. Manifest means clearly evident, clear, plain, indisputable."

271

Considering the testimony of the plaintiffs and defendant's driver as to the position of each car immediately prior to the impact, we find that this is not a case in which an opposite conclusion to that of the jury is clearly evident, as is required before this court can disturb the verdict. Griggas v. Clauson, 6 Ill App2d 412, 419, 128 NE2d 363 (1955).

Next examined is defendant's charge that it was prejudiced by improper rulings by the trial court during the testimony of both plaintiffs. Defendant states that "Krilcic testified that at the time she came to after the accident her sister's car was off of Cicero on 115th Street but that she did not know precisely where it was. She later testified that any knowledge she had concerning the location of the car after the accident came from something that she had heard from others since the accident. The defendant then moved to strike the witness's testimony regarding where the car was after the accident. This motion was denied." Defendant argues that the testimony was not based on Krilcic's personal knowledge but on information related to her by third persons, and her testimony on this issue was hearsay and it was error not to strike it.

On this contention the record shows there was a difference between court and counsel as to the area to be covered by defendant's motion. It is our interpretation of the record that the court endeavored to sustain defendant's motion insofar as it referred to the location of the car and to deny the motion as to where Krilcic located her sister. We find no prejudicial error here.

Defendant further asserts that "on the redirect examination of Rose, plaintiffs' attorney attempted to rehabilitate her by reading from her testimony at the first trial with reference to where she stopped her car at the intersection of 115th Street and Cicero Avenue. In so doing the plaintiffs' attorney read questions and answers from the first trial in which plaintiff Rose lo-

cated on a photograph marked plaintiffs' Exhibit 8 the position of her automobile. Plaintiffs' Exhibit 8 was marked at the first trial, but was not present at the second trial. None of the testimony from the first trial which was read contained any description of the photograph or any description of where on the photograph the plaintiff indicated that the car had come to a stop. Without the presence of the photograph this testimony from the first trial lacked any probative value. It could not rehabilitate or impeach because it did not tell the jury where the plaintiff had previously testified that the car had stopped. . . . [I]t was improper to permit plaintiffs' counsel to imply that she had so testified."

As to the redirect examination of Mrs. Rose, plaintiffs state that defendant's counsel, "according to his own statement, inquired of plaintiff Rose during cross-examination whether 'She at any time testified or pointed out to a photograph that her car was fifteen or twenty feet ahead of the stop sign.' Thus, it became necessary for plaintiffs' counsel to demonstrate nothing more by his reference to lost plaintiffs' Exhibit 8, used during the first trial, than that she had on another occasion identified the location of the place where she had stopped by reference to a photograph." The record indicates that the question of whether Mrs. Rose had "at any time testified or pointed out to a photograph that her car was fifteen or twenty feet ahead of the stop sign" was developed by defendant on cross-examination. In our opinion, plaintiffs' redirect examination of Rose regarding Exhibit 8 [a photograph which was not produced at the second trial] was within the scope of defendant's cross-examination and not improper.

■ Defendant further states that during the cross-examination of both plaintiffs, defendant sought to show that both had made prior inconsistent statements. The court sustained a number of objections on the ground that the questions were not impeaching. Plaintiff Rose

273

was cross-examined about the shape of the stop sign beside where she had stopped and how long 115th Street had been paved east of Cicero, in order to test her familiarity with 115th Street. Plaintiff Krilcic was cross-examined as to where her sister's car was when she came to in the car and what she saw immediately before the collision.

Defendant's authorities on impeachment include People v. Tate, 30 Ill2d 400, 197 NE2d 26 (1964), where it is said (p 403):

> "Impeachment of a witness by a prior contradictory statement is of course an accepted technique. As this court said in People v. Moses, 11 Ill2d 84, 87: 'Evidence of prior inconsistent statements by a witness is admissible to impeach his credibility. (People v. Smith, 391 Ill 172, 176.) Such evidence is not admitted as proof of the truth of the facts stated out of court, but to cast doubt on the testimony of the witness by showing his inconsistency, and an instruction to the effect should be given upon request. . . . It is therefore not hearsay.' "

Plaintiffs argue that whether matter is impeaching is, in the first instance, a question of law (Reilly Tar & Chemical Corp. v. Lewis, 326 Ill App 84, 88, 61 NE2d 290 (1942)), and the impeachment must be on a material matter, and it is improper to ask a witness questions on irrelevant matters on cross-examination solely for the purpose of impeaching or contradicting the witness (People v. Kirkwood, 17 Ill2d 23, 30, 160 NE2d 766 (1959)). In Sullivan v. Fawver, 58 Ill App2d 37, 46, 206 NE2d 492 (1965), it is said:

> "The testimony of a witness as to a collateral or immaterial matter is not subject to impeachment by proof of its prior contradictory statements."

274

We have examined the court's rulings complained of in the cross-examination of both plaintiffs and find no prejudicial error in the trial court's rulings on these questions.

Defendant complains that the trial court improperly denied defendant's request to inspect a report used by Lindsay to refresh his recollection prior to the time of giving testimony and out of court. During the colloquy on this point, plaintiffs' counsel referred to the document as his work product. Under interrogation by the court, Lindsay finally stated that everything he had testified to came out of his "own memory." The trial court denied defendant's request to inspect the report. Defendant further asserts that "the remarks of plaintiffs' attorney at the close of this episode were improper and prejudicial."

We agree with defendant that the remarks of plaintiffs' counsel, which were made in the presence of the jury, could be termed improper, but we find they were not prejudicial.

As to the right of opposing counsel to inspect documents used by a witness to refresh his recollection prior to his court appearance, it is said in 125 ALR 200:

> "Notwithstanding authority to the contrary, where a witness has refreshed his present recollection prior to the time of giving testimony by the use of papers or memoranda out of court, it has been held that he will not be obliged to produce them for the purpose of allowing the opposing party to make an inspection."

In 58 Am Jur, Witnesses, § 601, it is said:

> "But according to the authorities generally, the rule does not extend to the situation where a witness has

refreshed his present recollection prior to the time of giving his testimony by the use of papers or memoranda out of court. Moreover, there is no right of inspection unless the witness actually uses the papers for that purpose, and further, unless such papers do tend to refresh his memory."

In the 1968 Cumulative Supplement to Volume 58, p 67, it is said:

"The view that where a witness has refreshed his present recollection prior to the time of giving testimony by the use of papers or memoranda out of court, he will not be obliged to produce them for the purpose of allowing the opposing party to make an inspection of them, is not only qualified by the cases recognizing that the trial judge has a large discretion in the matter, but there is also authority to the effect that even when the witness' memory has been refreshed out of court, inspection of the memoranda used for the purpose should be had upon request."

Irrespective of whether the document in question was the work product of plaintiffs' attorney or not, we conclude that it was not an abuse of discretion and not error to deny defendant's request to see the report used by Lindsay, prior to testifying and out of court, to refresh his recollection.

█ As to the testimony of Lindsay, defendant contends that error was committed in the exclusion of evidence relating to the circumstances surrounding plaintiffs' witness Lindsay's resignation from the Illinois State Highway Police. "On cross-examination Lindsay was asked what were the circumstances surrounding his leaving the police force. The plaintiffs' objection was sustained. During the defendant's offer of proof Lindsay testified that he left the State Police Force rather

than face charges of drinking in uniform, filing a false report and perjury under oath at an inquest concerning an occurrence. During the offer of proof he testified that while under oath during another trial he admitted giving false testimony at the coroner's inquest." Defendant contends that the offer was of proper impeachment evidence and that it was error to have refused the evidence.

We find no error in excluding evidence as to Lindsay's resignation from the police force. We believe the controlling rule is stated in Elliot v. Brown, 349 Ill App 428, 434, 111 NE 169 (1953):

> "But, assuming Brown lied there, that fact could not be shown or argued to affect his credibility in subsequent litigation involving altogether different subject matter. While it is proper to reflect upon the credibility of a witness by showing that his reputation for truth and veracity in the neighborhood where he lives is bad, it is not permissible to reflect upon his credibility by establishing that on a former occasion he lied about an entirely unrelated matter."

Defendant next contends that plaintiffs were permitted to improperly cross-examine their own witness, Paul Wolff, who had been defendant's manager in 1954. In the 1961 trial he had been called by plaintiffs under section 60 as an adverse witness. He had subsequently retired, and in the instant trial he was called by plaintiffs as their own witness.

On direct examination, Wolff testified that he was called to the scene of the occurrence and arrived there after the automobile had been removed. He described the position of the truck and the damage to the truck and the guardrails along the highway. On cross-examination, Wolff also testified that gray paint appeared on the side but not on the front of the truck tractor's saddle tank. On redirect, plaintiffs' counsel asked the

witness when he had first mentioned the matter of the gray paint on the saddle tank. An objection to the question was made. Court and counsel had discussion out of the presence of the jury. On recross-examination, the witness stated "I did have a chance to see the Chevrolet automobile and I did have a chance to see its color and paint. The paint of the Chevrolet automobile compared with the paint I saw on the side of the saddle tank was identical."

Plaintiffs' counsel was allowed over the objection of the defense to ask the witness if he had mentioned the paint on the saddle tank and viewing the automobile prior to the instant trial, and if he had testified on those matters at the previous trial. The witness stated that he had mentioned these matters before but did not recall if he had testified to them at the earlier trial. Defense counsel repeatedly objected on the grounds that plaintiffs' counsel was cross-examining his own witness. Plaintiffs' counsel claimed to be surprised by the testimony and contended that he had the right to "awaken the conscience" of the witness.

Defendant's authorities on the right to "awaken the conscience" of a witness who unexpectedly gives testimony against the party calling him include People v. Michaels, 335 Ill 590, 167 NE 857 (1929), where it is said (p 592) :

> "If, however, the witness denies the alleged statements the party calling him must be concluded by his answers, and cannot show, either by the written statements of the witness or by other witnesses, that the witness did, in fact, make those statements, either for the purpose of impeachment or as original evidence of the facts sought to be proved."

Defendant argues that plaintiffs were concluded by Wolff's answers that he did not recall whether he had ever mentioned these facts before, and the vigorous

278

adverse reexamination of Wolff by plaintiffs' attorney was improper and defendant was greatly prejudiced. Defendant asserts that the tenor of the redirect examination was such as to suggest that Wolff was testifying falsely in collusion with the defendant. Defendant further states that the trial court improperly allowed Wolff to be examined regarding whether he had conferred with defendant's attorney before taking the stand; also, that it was improper for the court to allow plaintiff Rose to testify that she was present during the first trial and did not hear Wolff testify concerning anything about the automobile involved in the occurrence.

Plaintiffs assert that they were surprised by Wolff's statements on cross-examination and contend the scope of the cross-examination by defendant was beyond the scope of the direct. Plaintiffs claim that the statements made by Wolff on the redirect examination as to seeing the automobile and comparing the paint of the automobile with that on the saddle tank were made for the first time at this trial, and as Wolff had never testified to seeing the automobile at the prior trial, they had a right to assume that Wolff's testimony would be the same as it had been on the prior occasion. Plaintiffs argue that they had the right to show that Wolff did not testify at the prior trial concerning the comparison of paints the same as if he had testified inconsistently at the first trial. Authorities on this point include People v. Wesley, 18 Ill2d 138, 163 NE2d 500 (1960), where it is said (pp 150–151) :

"It is a general rule that a party who calls a witness to testify cannot directly impeach his testimony, but certain exceptions indicate that the rule may be in the process of erosion. Thus, where the witness unexpectedly gives testimony against the party calling him, such party has the right of examination to show that the witness gave surprise tes-

279

timony and to specifically call his attention to former inconsistent statements made by him for the purpose of refreshing his memory or awakening his conscience to the end that he may relent and speak the truth if he is lying. People v. Michaels, 335 Ill 590; People v. O'Gara, 271 Ill 138.

". . . The extent to which such cross-examination shall be permitted rests largely in the discretion of the trial judge who can best pass upon the question from the manner of the witness, his attitude and appearance. . . . Subject to the factual situations involved, the principles set forth in the cases relied upon by defendant are not contrary to those above set forth.

". . . We concede that the party claiming surprise should do so with diligence, but we believe that the ultimate decision as to when such cross-examination is to be received is best left to the sound discretion of the trial judge depending upon the facts and circumstances developed at the trial. This view is consistent with the principles heretofore announced."

Although Supreme Court Rule 238 was not effective until January 1, 1967, subsequent to the instant trial, we believe its tenor should be noted here. The provisions of Rule 238 (Hostile Witnesses) are:

"If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination. The party calling an occurrence witness, upon the showing that he called the witness in good faith and is surprised by his testimony, may impeach the witness by proof of prior inconsistent statements."

On this rule the Committee Comments were:

> "This rule is new. It extends the provision of section 60 of the Civil Practice Act authorizing cross examination to any witness who proves hostile or unwilling and the provision authorizing impeachment by prior inconsistent statements to any occurrence witness who surprises the party calling him by testimony on a material matter that is inconsistent with a prior statement made by him."

Considering the importance and materiality of the testimony of Wolff that the color of the Chevrolet was identical with the paint he saw on the saddle tank of defendant's truck, we believe that the cross-examination of Wolff by the defendant on this point was properly permitted. We also conclude that although there was no evidence of a prior inconsistent statement by Wolff on the paint issue, there was sufficient prior conduct by him on which plaintiffs could base a charge of surprise. Therefore, the redirect examination of Wolff was properly permitted.

Defendant next contends that "the plaintiffs' attorney was guilty of prejudicial misconduct." Defendant's first complaint is that plaintiffs' counsel, during direct examination of Krilcic, asked the witness if she had worked since the time of the occurrence. Upon objection by defense counsel, plaintiffs' counsel withdrew the question. The defendant states that the question was improper because no foundation was laid and was prejudicial in that it suggested to the jury an element of damages which could not properly be considered.

We find no prejudicial misconduct here. The witness testified on cross-examination that she was not employed at the time of the occurrence and had always been a housewife. Plaintiffs assert the question as to whether Mrs. Krilcic had worked was withdrawn, no in-

struction on lost wages was given for her, and no complaint is made that the verdict for her was excessive.

Defendant's second contention of prejudicial misconduct by plaintiffs' counsel pertains to the cross-examination of defendant's witness, Meyers. At the close of the plaintiffs' examination of the witness, plaintiffs' counsel identified plaintiffs' Exhibit 175 and ascertained from the witness that it bore the witness's signature and was in the same condition as when he signed it. "No further questions were propounded of the witness regarding this exhibit. No attempt was made to impeach the witness or to refresh his memory from the statement. When the plaintiffs' attorney failed to inquire further regarding plaintiffs' exhibit 175, the defendant moved to strike all testimony pertaining to that exhibit. This motion was denied." Defendant contends that these questions can have served only the purpose of suggesting to the jury that on a prior occasion Meyers had given information contrary to that given on the witness stand. We find no reason to conclude that the jury would have made the inference suggested by defendant on appeal. We do not consider the questions relating to Exhibit 175 to be prejudicial to defendant.

Defendant also contends that certain remarks of plaintiffs' counsel in closing argument were misstatements and prejudicial. We have reviewed the remarks complained of and do not consider them to be prejudicial. They appear to be within the scope of the evidence.

Next considered is defendant's contention that error was committed in the giving of certain of plaintiffs' instructions and the refusal of one of defendant's instructions.

Plaintiffs' instruction No. 11–A, IPI 60.01, set forth the statutory provisions requiring a driver of a motor vehicle to give "a signal of intention to turn right or left."

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

" 'No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement.

" 'A signal of intention to turn right or left shall be given during not less than the last 100 feet traveled by the vehicle before turning.'

"If you decided that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence."

Defendant argues that instruction No. 11–A does not recite any law pertaining to any issue of law involved in this case. There was no evidence that defendant's truck did turn or that its driver intended to turn at this intersection.

On instruction No. 11–A, plaintiffs argue that the evidence showed defendant turned its vehicle from a direct course upon the highway when such a movement could not be made with reasonable safety, and "moreover, it was one of a series and was not directory in nature. The argument concerning signals is purely theoretical. The jury knew what parts of the statute applied to the situation."

Plaintiffs' instruction No. 12, IPI 60.01, set forth the statutory provisions requiring that "no person shall drive a vehicle upon any public highway in this State at a speed greater than is reasonable and proper."

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

" 'No person shall drive a vehicle upon any public highway in this State at a speed greater than is reasonable and proper having regard to the traffic and the use of the way or so as to endanger the life or limb or injure the property of any person.'

"If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence."

Defendant argues there was no evidence to support the giving of this instruction—"Poulos testified that the highest speed he reached was twenty-five to thirty miles per hour. Neither plaintiff testified regarding the speed of the truck. . . . The record contains no facts from which the jury could find that the truck's speed was unreasonable or improper."

Plaintiffs argue as to instruction No. 12 that the testimony of Poulos as to the speed at which he was driving and the evidence of the distance traveled by the truck after the collision provided sufficient evidence to warrant this instruction.

Plaintiffs' instruction No. 21–A, IPI 60.01, states:

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

" 'When upon any highway in this State during the period from sunset to sunrise, every motor vehicle shall carry two lighted lamps showing white lights or lights of a yellow or amber tint, visible at least 500 feet in the direction toward which the motor vehicle is proceeding.

" 'Any motor vehicle, the length of which together with any trailer in tow thereof is more than 25 feet and the width of which is more than 80 inches while being operated on the highways of this State outside the limits of cities, villages, or incorporated towns, during the period from sunset to sunrise, shall display in front of the vehicle two yellow or amber lights, one on each upper front corner of the vehicle, which shall be plainly visible at a distance of 500 feet.'

"If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence."

Defendant maintains that "the lights on the defendant's truck were lighted. There was no testimony that the lights were not lighted. Nor was there any evidence of how far in front of the truck the lights were visible. There were no facts from which the jury could infer that the defendant had violated this statute."

As to instruction No. 21–A, plaintiffs argue that the reason for giving the instruction was established by the testimony of Poulos and by Mrs. Krilcic's statement that she saw "a black wall with red lights across the top coming toward us." The testimony of Poulos included: "I had what I call marker lights. The marker lights are red in the back and amber in the front. . . . I don't

recall if the only lights that I had on were marker lights and parking lights. I don't remember. I know I had lights on. I don't remember whether they were the parking lights or the lower beam that I had on. I just don't remember. I believe that either the parking lights or the lower beams were on. Parking lights are two lights right on top of the headlights on that particular truck. . . . I am certain I had these marker lights on."

On these instructions defendant cites Shore v. Turman, 63 Ill App2d 315, 321, 210 NE2d 232 (1965):

". . . [I]f there are no facts supporting the theory, it is error to instruct on that theory. . . . To inject into a case by way of instructions an issue not fairly presented by the pleading and the evidence in the case is reversible error."

 We find no prejudicial error in the giving of these three instructions. The record contains sufficient evidence in each area so as to place the giving of these instructions within the sound discretion of the court.

 Defendant next complains of plaintiffs' instruction No. 13–A, IPI 20.01, as follows:

"The plaintiffs claim they were injured and sustained damages while exercising ordinary care, and that the defendant was negligent in one or more of the following respects:

" 'Operated and controlled its motor truck so that as a direct and proximate result thereof the plaintiffs were injured;

" 'Controlled the motor truck without keeping a proper and sufficient lookout;

" 'Turned the motor truck from a direct course upon the highway when such movement could

not be made with reasonable safety, in violation of a certain statute;

" 'Failed to have proper headlights on the motor truck, in violation of a certain statute;

" 'Operated the motor truck at a high and dangerous rate of speed, in violation of a certain statute.'

"The plaintiffs further claim that one or more of the foregoing was the proximate cause of their injuries.

"The defendant denies that it was guilty of any of the negligence claimed by plaintiffs and denies that the plaintiffs were in the exercise of ordinary care. The defendant further denies that the plaintiffs were injured or sustained damages to the extent claimed."

Defendant argues that it was improper to give this instruction because there was no evidence that the truck was not lighted in accordance with the statute or that the truck was operated at an improper speed. Defendant further argues there was no evidence that Poulos turned the truck from its direct course on the highway or that he was not keeping a sufficient lookout. We believe there was sufficient evidence for the giving of the instruction.

Defendant further argues that the court improperly refused defendant's instruction No. 5, IPI 60.01, which set forth the statutory provisions that provided:

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute, which provided in part as follows:

" 'The driver of a vehicle shall stop as required by Section 86 of this act at the entrance to a through highway and shall yield the right of

way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard, but said driver having so yielded may proceed at such time as a safe interval occurs.'

"If you decide that the plaintiff, Mary Josephine Rose, violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the plaintiffs were contributorily negligent before and at the time of the occurrence."

Defendant argues that this instruction presented the defendant's theory of the case, and that because there was evidence to support it, it should have been given to the jury.

Plaintiffs argue, "There was no evidence that plaintiff Rose did not stop and yield the right-of-way to vehicles on Cicero Avenue. Poulos did not know either where the Rose car was or where he was at the time of the collision. Meyers did not. There was no debris found in Cicero Avenue. Plaintiffs' testimony was uncontradicted. Indeed, without some evidence to support a violation of this statute, the giving of such an instruction would have been reversible error." In our opinion it was not error to refuse defendant's instruction No. 5. The testimony of plaintiffs was that they stopped west of Cicero Avenue, and there was no testimony to the contrary.

Defendant further contends that error was committed in that the jury, after several hours of deliberation, was advised by the bailiff that they were to be allowed one hour in which to come to a decision. During the consideration of defendant's motion for a new trial, testimony on this question was taken. Ann McWherter, a dep-

uty sheriff, appeared as a witness for the defendant. She testified: "I was the custodian in charge of the jury when they commenced their deliberations on November 22, 1965. Those deliberations began about 5:30 in the afternoon. At 12:20, during the course of their deliberations, I did have occasion to communicate with them. At 12:20, I went and rapped on the door and spoke to them and told them that they only had one hour or more to deliberate, which I was instructed to do. I received those instructions before Judge Finnegan went for his dinner in the evening. The jury returned its verdict at 1:00 o'clock a. m. on the 23rd."

After the testimony of McWherter was taken the court made the following statement: "Now, for the purpose of the record, I want to reiterate that I did not instruct this woman in the fashion in which she has testified." At a later hearing the plaintiffs called three jurors as witnesses. Each of them testified that during their deliberations the jury was not given any instruction by the bailiff that there was a limitation on the time that they would be allowed in which to reach a verdict. At the conclusion of the hearing the court denied the post-trial motion of defendant.

Defendant contends that the consideration of the matter was inadequate, and defendant was not given a fair and impartial hearing.

On this point, we believe a discussion of defendant's authorities is unnecessary because of the factual disposition of the question by the court. We find no prejudicial error in the manner in which the trial court conducted the hearing, and the testimony of the three jurors was a sufficient basis for the court to deny the post-trial motion of defendant for a new trial because of improper communications with the jury during its consideration of the case.

Finally, we consider defendant's contention that the trial court improperly interjected itself into the trial and

"persisted in giving resumes of the testimony, characterizing the evidence and taking over the interrogation of witnesses on a partisan basis." Defendant further complains that instead of simply ruling on plaintiffs' objections to impeaching evidence, the trial court insisted on reciting and characterizing the evidence, and the record "reflects the inaccuracy of these recitations and characterizations"; that the court, by insisting on giving its version of the testimony, invaded the province of the jury, and its intervention was not neutral but favored plaintiffs.

■■■ We agree with defendant's assertion that "great harm is done when the court misstates evidence or usurps the jury's function by characterizing the evidence."

■■■ The record reflects that the trial court was quite active in the trial and that there were many spirited exchanges between counsel. The age of the occurrence (1954), a previous trial (1961), and depositions, made a basis for the assertion of inaccurate and faulty recollection by the witnesses in the instant trial (1965). As a result, there were many and extended charges of impeachment, on which it was difficult to rule. In ruling on objections, the court frequently recited and characterized the evidence in the presence of the jury.

A resume of the rulings which defendant claims were improper and prejudicial would unduly lengthen this opinion. It may be reasonably argued that many of these discussions and rulings by the court should have taken place out of the presence of the jury.

The remarks made in Northern Illinois Gas Co. v. Wienrank, 66 Ill App2d 60, 76, 213 NE2d 411 (1966), are appropriate here:

> "It is also contended by Defendants that the Trial Court in making rulings on the evidence, by implication criticized or rebuked counsel for Defendants

in a manner which prejudiced Defendants in the eyes of the jury and also that Defendants were prejudiced when the Trial Court questioned certain witnesses and thereafter made rulings. While the record discloses that the Trial Court sustained Petitioner's objections to Defendants' evidence and offers of evidence, such rulings were consistent with the precedents referred to in the course of this opinion. As Stated in Department of Public Works & Buildings v. Diggins, 374 Ill 11, at page 16, 27 NE2d 826, while remarks of a court made to or in the presence of the jury and having the force of an instruction or opinion on the evidence may be ground for reversal, the Trial Court may properly give its reasons for ruling upon the evidence and it should be accorded reasonable latitude in so doing. As indicated in that case, not every unguarded expression of the Judge stating his reason for his ruling can or should be treated as a ground for granting a new trial unless prejudicial error is clearly shown. The court undertook to question certain witnesses. As the record shows, this was largely done prior to ruling on motions as to their testimony and obviously for the purpose of being clear as to the testimony before ruling on the motion. Such occasional questioning by a Trial Court in absence of a manifest abuse of such procedure would not constitute reversible error (People v. Filas, 369 Ill 51, at 55, 15 NE2d 496)."

After examining this record at length, we conclude that no prejudicial errors were caused by the trial court's activity and its remarks and rulings made during the trial in the presence of the jury.

In sum, we find no prejudicial error that would warrant the granting of a new trial. It is our opinion that this

record shows the proper issues, together with adequate instructions, were submitted to the jury, and that both sides received a fair trial.

For the reasons given, the judgments of the Circuit Court of Cook County are affirmed.

Affirmed.

ADESKO, P. J. and BURMAN, J., concur.