Wilfred POULIN, Appellant,

v.

Dr. Harvey ZARTMAN, Appellee.

Dr. Harvey ZARTMAN, Cross-Appellant,

v.

Wilfred POULIN, Cross-Appellee.

Nos. 2120, 2127.

Supreme Court of Alaska.

Nov. 12, 1975.

Theodore R. Dunn and Warren W. Matthews, Jr. of Matthews, Dunn & Baily, Anchorage, James A. Parrish of Parrish Law Office, Fairbanks, for appellant and cross-appellee.

James J. Delaney and Robert L. Eastaugh of Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, for appellee and cross-appellant.

## OPINION

Before RABINOWITZ, C. J., CONNOR, J., and STEWART, Superior Court Judge.

CONNOR, Justice.

This appeal arises from a medical malpractice action. It raises issues concerning admissibility of evidence, standards of conduct by a physician, and the "informed consent" doctrine.

A suit was brought by Wilfred Poulin on behalf of his infant daughter, Courtney Poulin, against Dr. Harvey Zartman. Poulin brought this action for damages alleging that Zartman improperly administered oxygen to Courtney, thereby causing her to become totally blind, and that Zartman's failure to properly treat jaundice caused severe brain damage in the child. Poulin also contended that Zartman administered treatment to Courtney without the informed consent of either of Courtney's parents.

After a trial in the Superior Court in which a jury verdict was rendered against him on August 25, 1973, Poulin moved alternatively for a judgment notwithstanding the verdict or a new trial. These motions were denied, and this appeal followed. Dr. Zartman has filed a cross-appeal claiming error in the denial of costs and attorneys' fees.

## I. FACTS

Courtney Poulin was born at approximately 3:00 p. m. on February 9, 1968. She was a premature infant of about 28 weeks gestation. The baby was delivered by Dr. Claire A. Renn at the Anchorage Community Hospital. Dr. Renn summoned Dr. Harvey Zartman, the pediatrician then on duty, and Dr. Zartman saw Courtney for the first time at 3:30 p. m., one-half hour after her birth.

Dr. Zartman found the infant in severe respiratory distress and he diagnosed her condition as either "hyaline membrane disease (HMD), or respiratory distress syndrome (RDS)".[1] There is disagreement as to whether Dr. Zartman properly diagnosed HMD, but all witnesses agreed that Courtney Poulin was suffering respiratory distress and did require oxygen. Dr. Zartman ordered supplemental oxygen at "5 to 8 liters per minute or higher if necessary to keep *pink*." The propriety of ordering oxygen to be administered in this manner was one of the central issues in the trial.

Courtney continued to receive supplements of oxygen until 12:00 p. m. February 16, 1968. Oxygen-weaning commenced on the afternoon of February 15, 1968, and all oxygen supplements were ended at noon on February 16, 1968. Courtney Poulin subsequently became totally blind. She is suffering from retrolental fibroplasia (RLF). It is undisputed that excessive oxygen results in a higher incidence of RLF. However, there are studies indicating that RLF can occur in premature babies who have had virtually no oxygen supplement at all.

At 7:00 a. m. February 11, 1968, the baby was noted to be jaundiced and this condition continued in varying degrees through at least February 17, 1968. Jaundice may indicate the presence of "indirect bilirubin" in the blood. Indirect bilirubin can cause brain damage. Nevertheless, Dr.

Zartman did not regard a bilirubin test as necessary. Today, Courtney Poulin is severely mentally retarded. Plaintiff contended at trial that the retardation resulted from a disease known as kernicterus, which is caused by elevated bilirubin in the blood. Plaintiff further contended that a "simple, non dangerous" bilirubin test could have detected the condition and thus led to alleviating it. However, plaintiff acknowledges that testimony concerning the cause of Courtney's mental retardation was in conflict.

Mrs. Poulin, Courtney's mother, was not contacted by Dr. Zartman until February 19, 1968. While Courtney was in the hospital Dr. Zartman did talk with Mr. Poulin, but there is conflict as to whether he discussed the risks attendant to oxygen therapy with the father.

Following Courtney's discharge from the hospital it was noticed that she was not developing properly. She was subsequently diagnosed as being totally blind, resulting from retrolental fibroplasia (RLF), and severely mentally retarded. The Poulins then brought suit against Dr. Zartman.

### Oxygen Administration

One of the key issues at trial concerned whether Dr. Zartman ordered an excessive amount of oxygen for Courtney, thereby causing retrolental fibroplasia (RLF) which resulted in her total blindness. It will be recalled that excessive oxygen has been shown to cause an increased incidence of RLF. In 1968, in Anchorage, Alaska, precise gauges for monitoring the amount of oxygen in the blood were not available. Thus, less accurate means of averting excessive oxygen had to be relied upon.

An undisputed index of insufficient oxygen in the blood is the condition known as cyanosis. One who is cyanotic, i. e., oxygen deficient, becomes blue in the mucus membranes, lips, and skin. This can vary

---

1. Apparently respiratory distress syndrome (RDS) and hyaline membranne disease are not synonymous. Rather, RDS is a genera term and HMS is one form of respiratory distress syndrome. A. Schaffer, *Diseases of the New-born* 105 (2d ed. 1966).

in degree with the first indicators being a "duskiness" in appearance. Apparently at the time that oxygen administration was commenced, Courtney was cyanotic. The last reported observation of cyanosis was on February 12, 1968, at 8:30 a. m. Oxygen treatment continued to 12:00 p. m. on February 16, 1968.

Plaintiff offered substantial expert testimony[2] endorsing a system of oxygen-minimization referred to as "titration". Essentially this method reduces the oxygen concentration to a point at which a baby begins to turn cyanotic. The level then is raised slightly above that point and periodically the process is repeated. Defendant countered with his own experts,[3] all of whom felt that Dr. Zartman's methodology was adequate.[4] Zartman's methodology apparently consisted of "working down" from a concentration that was wholly adequate to avoid cyanosis, as opposed to "working up" from a concentration that was insufficient to prevent cyanosis, i. e., titration.

Poulin produced evidence from the American Academy of Pediatrics which stated that atmospheric oxygen concentration[5] "should be kept at the lowest possible level that will relieve the symptoms for which it is given. If possible, it should not be over 40 percent." The nurses' records reflect that from 8:30 a. m. on February 12, 1968, to 5:00 p. m. on February 15, 1968, the oxygen concentration was almost always above, and never below, 40 percent. During this 3½ day period, the liter flow of 4 was reached at 6:30 p. m. on February 13, 1968. It remained at that flow level for the next 43½ hours, during which time oxygen concentration was at least 40 percent.[6]

Dr. Zartman offers three explanations for this high concentration of oxygen. He states that he ordered the baby to be "kept pink" and that if it is not cyanotic it is pink and there is "no gray in-between." This, of course, begs the question of how much oxygen concentration is the least necessary to keep the baby pink.

The doctor also stresses that throughout this period the baby was experiencing distress known as apnea, a condition of temporary cessation of breathing. Continuous oxygen therapy often will relieve the severity of apnea and many of the experts acknowledged that oxygen therapy is appropriate when apnea is present. Dr. Zartman's brief on appeal does not attempt to justify the quantity of oxygen by the presence of apnea, but only the continuous use of oxygen for nearly 3½ days following the last recorded incident of cyanosis.

---

2. *E. g.*, Dr. David Abramson, Chief of the Division of Newborn Medicine Neonatology, Georgetown University Hospital; Dr. Leonard Krassner, a practitioner and teacher of pediatrics at Yale University School of Medicine; Nurse Jeryl Gagliardi, a clinical specialist in the newborn special case unit at Yale New Haven Medical Center.

3. *E. g.*, Dr. Charles Barlow, professor of neurology at the Children's Hospital Medical Center of Harvard Medical School; Dr. Thomas Oliver, Chairman of the Department of Pediatrics at the University of Pittsburg and medical director of Children's Hospital in Pittsburg; Dr. Robert Polley, a pediatrician and faculty member at the University of Washington Medical School.

4. Some of defendant's witnesses actually regarded "titration" as dangerous under the circumstances.

5. Atmospheric oxygen concentration is the percentage of oxygen in the air. It is not strictly correlated to oxygen liter flow, through there is apparently some rough correlation. In turn, concentration does not necessarily reflect the amount of oxygen actually in the blood stream. A baby experiencing severe respiratory problems might not be able to absorb the oxygen at all. Today the amount of oxygen in the blood stream can be measured. However, in 1968, this sophisticated monitoring was not possible.

6. During this period Dr. Zartman did not attend the baby at all. Approximately 21 hours after the flow was reduced to 4, Drs. Peterson and Tower did visit the child. No reduction of flow was ordered despite an apparent absence of cyanosis. About 22 hours after their visit (at 1:15 p. m. on February 15, 1968), Dr. Zartman re-examined the child and ordered a weaning from all oxygen.

Finally, Dr. Zartman points to testimony suggesting that the machine monitoring the air concentrations (a myra oxygen analyzer) was inaccurate. He particularly stresses that due to the construction of the incubator at 4 liters it was "almost impossible" to have a 40 percent concentration of oxygen.[7] Poulin's response is that the oxygen analyzer was never tested and the nurses' notes are in fact the only record available as to what the concentration actually was.

In summary, oxygen can be a dangerous substance, and excessive doses have been associated with a blindness-inducing disease known as retrolental fibroplasia (RLF). Courtney Poulin is blind as the result of RLF. Poulin's experts testified that the preferred method of controlling excessive oxygen in 1968 was titration, i. e., "testing up" from a cyanotic state until the condition is relieved. Dr. Zartman's experts supported his method of monitoring excessive oxygen, i. e., relieve the symptom of deficiency, in this case cyanosis, then periodically "test down". For at least a 40-hour period, Courtney Poulin received high concentrations of oxygen without any testing, up or down.

### Jaundice, Bilirubin, and Retardation

As previously noted, Courtney experienced continuing jaundice from at least February 11, 1968, to February 17, 1968. Jaundice may indicate elevated bilirubin in the blood. Elevated bilirubin can lead to kernicterus which is a disease causing brain damage. Bilirubin can be detected by a blood test. No such test was ordered. Today, Courtney Poulin suffers from severe mental retardation.

Dr. Zartman's defense is two-fold in nature. First, he claims that the degree of jaundice observed was insufficient to warrant a bilirubin test. In support of this contention he notes that two other doctors saw the infant and also failed to order the test. Furthermore, head nurse Gill testified that the degree of jaundice, apparently a common symptom in newborn infants, was not unusual.

Zartman's second defense is lack of proof of causation. He solicited expert testimony suggesting that Courtney's symptoms are not reflective of brain damage resulting from excessive bilirubin, but instead suggest mental deficiencies resulting from inadequate oxygen. Poulin himself acknowledges that causation was in dispute.

The relevance of the aforementioned facts to the legal issues on appeal is as follows. Poulin contends, among other things, that the evidence does not support the verdict. But, standing alone, the evidentiary conflicts on the issues of the appropriate method of oxygen administration, the cause of Courtney's mental retardation, and the informed consent doctrine would preclude reversal by this court. However, when the conflicting evidence is examined with an eye to the testimony that was admitted over objection, the instructions that were denied, and the standard of care that was submitted to the jury, the result is more problematic. In the circumstances, a review of each point raised on appeal is imperative.

## II. LEGAL ISSUES

For the purposes of clarity we have sorted the numerous legal issues into three categories: prejudice, standard of care, and informed consent. These are merely labels of convenience. Appellant urges 14 separate reversible errors by the trial court. The following provides a summary of the questions presented on appeal:

---

7. Dr. Zartman does not directly dispute the contention that 40 percent concentration should be exceeded only when symptoms call for it. Instead, he stresses that the 40 percent figure is a rough rule of thumb and fails to take into account the assimilative capacity of the patient. Thus, he concludes, "many babies require much higher environmental concentrations than 40 percent."

### (a) *Prejudice*

(1) Did the court err in admitting testimony concerning Patricia Poulin's lack of prenatal care?

(2) Did the court err in admitting testimony concerning Wilfred Poulin's occupational and military background?

(3) Did the court err in refusing to instruct the jury that Patricia Poulin's failure to obtain prenatal care was irrelevant to Dr. Zartman's negligence or his duty of disclosure?

(4) Did the court err in refusing a supplemental instruction stressing that Courtney Poulin, the infant, and not her parents, was the real party in interest and that she would receive the benefits of any damages awarded?

(5) Did the court err in refusing to consider juror affidavits in support of Poulin's motion for a new trial, when those affidavits asserted that the jury was influenced by improper considerations of sympathy and bias?

(6) Did the court err in refusing to admit evidence concerning Zartman's liability insurance?

### (b) *Standard of Care*

(1) Did the court err in refusing to admit medical textbooks concerning certain substantive issues?

(2) Did the court err in instructing the jury that certain medical textbooks could not be used as substantive evidence?

(3) Did the court err in refusing to give instructions holding the defendant to a higher standard of care than normal, and to a nationwide standard of care?

(4) Did the court err in refusing instructions concerning the defendant's duty to read nurses' notes and alert nurses to their failure to comply with the doctor's orders?

(5) Did the court err in refusing to instruct the jury that Courtney's special susceptibilities did not reduce the standard of care with which defendant must comply?

(6) Did the court err in failing to grant a judgment notwithstanding the verdict or new trial on the issue of negligent administration of oxygen?

### (c) *Informed Consent*

(1) Did the court err in omitting reference to the informed consent issue in the general mandatory instruction?

(2) Did the court err in failing to grant a judgment notwithstanding the verdict or new trial on the issue of informed consent?

### (d) *Denial of Costs and Attorney's Fees*

(1) Did the court err in denying costs and attorney's fees to Dr. Zartman?

## III. PREJUDICE

Appellants' first claim of error asserts that the court improperly admitted testimony on Patricia Poulin's lack of prenatal care, and then compounded this harm by refusing to give plaintiff's supplemental instruction 4–A [8] which, paraphrased, states that the mother's lack of prenatal care is irrelevant to the issue of defendant's negligence or breach of duty concerning informed consent.

Questioning concerning the mother's lack of prenatal care arises at two points in the trial. First, during cross-examination of Mrs. Poulin, defense counsel asked her whether she had seen a doctor upon discovering she was pregnant, or at any time prior to Courtney's birth. The mother answered, over objection, that she had not. The second incident occurred during defense counsel's cross-examination of Mr. Poulin. At that time defense counsel, despite repeated objections, was able to establish that the Poulins had not seen a doctor prior to Courtney's birth, and that they had not done so because they favored the concept of "natural" childbirth.

---

8. "The fact that Patricia Poulin did not seek prenatal care prior to the day on which Courtney Poulin was born is irrelevant on the question of defendant's negligence or whether or not defendant breached his duty of disclosure."

The defense counters any claim of reversible error concerning this testimony on two interrelated grounds. First, defendant asserts that the testimony was clearly relevant to the issues of proximate cause and damages. Second, it is asserted that the inquiry was not extensive and thus any prejudice which may have resulted did not outweigh the relevance of the testimony.

The standard of review on appeal is certain. A trial judge will only be reversed for admitting prejudicial, but otherwise relevant, evidence if he has committed a "clear abuse of discretion." *Davis v. Chism,* 513 P.2d 475, 479 (Alaska 1973).[9] Thus, we first must consider the relevance of the testimony and then determine whether its prejudicial effect so outweighed its probative value that admission by the trial judge constituted a "clear abuse of discretion". *See, e. g., Love v. State,* 457 P.2d 622 (Alaska 1969).

Alaska case law defines the test of relevancy. "To be of sufficient relevance for admission, testimony, documents or other evidence must have some tendency in reason to establish a proposition material to the case." *Hutchings v. State,* 518 P.2d 767, 769 (Alaska 1974). The dual concepts of logical relevance, i. e., some tendency to establish the ultimate point for which the evidence is offered, and materiality, i. e., germaneness of the ultimate point to issues in the trial, have been emphasized repeatedly in our opinions.[10]

Zartman asserts that testimony concerning lack of prenatal care and philosophical attitudes concerning childbirth are relevant to the issues of proximate cause and damages. He deduces that conclusion from the undisputed fact that the likelihood of prematurity is higher in the absence of prenatal care and that blindness and brain damage are more prevalent in premature babies than in fullterm babies.

However, there was no dispute about Courtney Poulin's prematurity. Dr. Zartman was called to treat an infant born at about 26 to 28 weeks of gestation. Likewise, there was no dispute concerning the statistically higher incidence of blindness and brain damage in premature infants. The issue in this case centers on whether the baby's prematurity or Dr. Zartman's care caused Courtney's maladies. The reasons for Courtney Poulin's prematurity are simply not material to any issue in this case. No testimony was offered at any point suggesting that premature babies who lacked prenatal care have a higher incidence of blindness or brain disease than prematures with prenatal care.[11] And certainly the parents' philosophic reasons for failing to obtain prenatal care are both irrelevant and immaterial.

To use the language in *Hutchings v. State,* 518 P.2d 767, 769 (Alaska 1974), we conclude that this testimony was erroneously admitted, since "[t]o be of sufficient relevance for admission, testimony . . . must have some tendency in reason to establish a proposition material to the case." The reasons for Courtney Poulin's prematurity are not material to this case. Thus the testimony concerning lack of prenatal care and the Poulins' attitudes towards "natural childbirth" should have been excluded.

Zartman urges that Poulin has waived any objection to the testimony by submitting an exhibit which itself refers to lack of prenatal care. Appellee cites C. McCormick, *Evidence* § 55, at 128 (2d ed. 1972), for his waiver contention. How-

---

9. This comports with Civil Rule 43(b), which favors the admissibility of evidence in the absence of a clear rule to the contrary.

10. *See, e. g., Hartsfield v. Carolina Casualty Insurance Co.,* 451 P.2d 576, 578 (Alaska 1969) ; *Mitchell v. Knight,* 394 P.2d 892, 896 (Alaska 1964). *See generally,* C. McCormick, Evidence § 185, at 434 (2d ed. 1972).

11. Appellee argues that testimony by one of plaintiff's own experts did establish such a link. However, our review of the cited transcript shows no correlation to blindness or brain disease and the witness (Nurse Jeryl Gagliardi) concludes that "lack of prenatal care, per se, probably doesn't have as much to do with it."

ever, McCormick goes on to state that if a party's objection to evidence is overruled (as was the case here) he may then treat this as the "law of the case" and submit his own evidence to explain or rebut the admitted evidence, and such conduct will not constitute a waiver. McCormick, *supra*, § 55, at 128–29.

We turn now to whether admission of this testimony was harmless or prejudicial error. Poulin simply asserts that the testimony, constituting an attack on the parents, prejudiced the jury against rendering a verdict for the child. Zartman goes no further than to state that Civil Rule 61 prohibits reversal for so-called "harmless error."

■ There is no doubt that appellant has the burden of proving both error and prejudice. *Zerbinos v. Lewis*, 394 P.2d 886, 889–90 (Alaska 1965). However the test of "harmless error" is a subtle one. Since the operative language in Civil Rule 61 and Criminal Rule 47(a) is identical,[12] case law in the criminal area is applicable and instructive.[13] The definitive Alaska opinion concerning "harmless error" is *Love v. State*, 457 P.2d 622 (Alaska 1969).

■ The *Love* decision held that harmless error does not mean that "elided from the record, there would be enough evidence to support a [verdict]." It is not this court's function to consider "how the error would have affected us if we had tried the case, but how it may have affected ed a jury of reasonable laymen." *Love, supra*, at 630. *See also Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239,

90 L.Ed. 1557 (1946). This standard does not require proof of harm beyond a reasonable doubt. Rather, "the members of this court must necessarily put themselves, as nearly as possible in the position of the jury in order to determine whether, as reasonable men, the error committed probably affected their verdict." *Love, supra*, 457 P.2d at 631 n. 15 [citations omitted].

■ We have carefully reviewed the record and transcripts and familiarized ourselves with the testimony and evidence of both sides. We are impressed by the complexity of the facts which gave rise to this litigation. We also are confident that any jury would appreciate the grave impact which a verdict for either party would have upon the nonprevailing side. Additionally, we have considered that the challenged testimony consumed a very small amount of time in a lengthy trial. There is no indication that Patricia Poulin's lack of prenatal care was mentioned by the defendant during closing argument. In light of the record as a whole, we believe that a reasonable jury would not have been affected by this testimony and that this particular jury in fact was not affected by this testimony. We conclude that this was harmless error.

Poulin claims that the trial court erred in failing to give plaintiff's supplemental instruction 4–A. That instruction stated:

"The fact that Patricia Poulin did not seek prenatal care prior to the day on which Courtney Poulin was born is irrelevant on the question of defendant's negligence or whether or not defendant breached his duty of disclosure."

---

12. *Compare* Civil Rule 61:
"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard *any error* or defect in the proceeding *which does not*

*affect the substantial rights* of the parties." (emphasis added)
with Criminal Rule 47(a):
"(a) *Harmless Error.* Any error, defect, irregularity or variance *which does not affect substantial rights* shall be disregarded." (emphasis added)

13. *Cf. In re Cornelius*, 520 P.2d 76, 84 (Alaska 1974), applying the criminal "harmless error" test to a review of a disbarment proceeding.

It was clearly designed to correct any error in the admission of testimony regarding lack of prenatal care. Since we have found that the admission of that testimony was harmless error, the propriety of the court's failure to give supplemental instruction 4–A is moot.

Appellant next claims that the court erred in admitting testimony concerning Mr. Poulin's military and occupational background.

Mr. Poulin testified on direct examination concerning what Dr. Zartman had told him about Courtney's condition. The testimony went to the issue of informed consent. On cross-examination Mr. Poulin was asked, among other things, about the reasons for his military discharge (mental unsuitability) and the number of jobs that he had held during the nine-month period that he lived in Alaska (five). Defense counsel elicited these facts over continuing objections from plaintiff's attorney. This finally resulted in an extended in-chambers colloquy with the trial judge. On recalling the jury, defense counsel commenced questioning Mr. Poulin about his philosophy of natural childbirth. This is discussed above and need not be repeated here.

▬▬ Defense counsel then and now justifies this line of questioning on the grounds that it is background testimony designed to "flesh-out" a witness, and impeachment of credibility since Dr. Zartman contested Poulin's statements concerning the content of their conversation. But both at trial and on appeal defense counsel seems uncertain about the precise basis for this questioning. Appellee begins by talking about "background" and "demeanor" going to credibility. The argument then converts into urging that these questions had some bearing on damages. The thrust of this argument seems to be that somehow Courtney's parents' social class has some bearing on her actuarial lifetime earnings. However, this was not the basis for computing earnings-loss damages at trial, for there a pure statistical median was used.

Poulin urges that at best the prejudicial value of this testimony outweighed its probative value and at worst flatly violated the proscription against using particular wrongful acts to impeach credibility. That proscription is contained in Civil Rule 43(g)(11).[14] Since Civil Rule 43(g)(11)[b] clearly refutes any claim that the questions are valid as to credibility, and since the issue of damages was beyond the scope of direct examination, the only conceivable justification for this line of questioning rests in providing sufficient background to enable the jury to judge a witness' demeanor.

▬▬ It has been recognized that background information, such as a person's occupation, place of residence, etc., is useful in placing a witness in his "proper setting" so that a jury may better judge his credibility. *Alford v. United States,* 282 U.S. 687, 693, 51 S.Ct. 218, 75 L.Ed. 624 (1931). *RLR v. State,* 487 P.2d 27, 44 (Alaska 1971). But, while such preliminary questioning is generally permitted, "[t]here is a duty to protect [a witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate." *Alford, supra,* 282 U.S. at 694, 51 S.Ct. at 220.[15]

▬▬ Because we favor the reception of evidence in the absence of strong countervailing considerations,[16] we have on occa-

---

14. Civil Rule 43(g)(11) provides:
 "A witness may be impeached by the party against whom he was called by contradictory evidence, or by evidence that his general reputation for truth is bad, or that his moral character is such as to render him unworthy of belief. *He may not be impeached by evidence of particular wrongful acts,* except that it may be shown by the examination of the witness or the record of

a judgment that he has been convicted of a crime." (emphasis added)

15. *Accord, People v. Lane,* 21 Mich.App. 185, 175 N.W.2d 313, 314 (1970).

16. Civil Rule 43(b) provides:
 "(b) *Form and Admissibility.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. The admissibility

sion sustained rulings admitting evidence of an arguably prejudicial nature.[17] However, we also have affirmed the curtailment of wide-ranging cross-examination,[18] and have reversed a trial court which permitted a cross-examiner to paint with an unreasonably broad stroke.[19]

 Background or preliminary questions which are designed to discredit the witness as a person, and not as a witness, are improper cross-examination.[20] In the present case Wilfred Poulin testified on behalf of his daughter. Defendant introduced evidence of Poulin's military discharge, which did not result from lying or lack of veracity, but from "mental unsuitability." Defendant also elicited the fact that plaintiff had held five jobs during a nine month period of time, *over five years ago*. These facts would hardly indicate that the witness was therefore likely to commit perjury.[21] Such questioning *should not have been allowed*.

 Although we have concluded that this evidence was improperly admitted, we do not believe that it warrants a reversal of the judgment. Our reasoning here is similar to that which we have applied regarding the admission of evidence on Patricia Poulin's lack of prenatal care. Specifically, we note that this line of questioning consumed a very small amount of time in a lengthy trial. Nor was it emphasized or even reiterated during closing argument. Under these circumstances, we hold that

allowing this line of questioning was harmless error.

Appellant next urges that the trial court erred in refusing to give plaintiff's supplemental instruction No. 4 which, paraphrased, stressed that the infant was the real party in interest, and that she, and not her parents, would receive the sole and exclusive benefit of any award. The rejected instruction stated:

> "You are instructed that the plaintiff in this case is Wilfred Poulin as father and natural guardian of the child Courtney Poulin. In law Wilfred Poulin brings this action solely and exclusively on behalf of Courtney Poulin in a representative capacity. This is done because the law prohibits a minor child from bringing the action in her own name. Neither Wilfred Poulin nor Patricia Poulin are plaintiffs in their own capacity in this action and any damages awarded by you under these instructions will go to the sole and exclusive benefit of Courtney Poulin."

 Poulin offers three cumulative points to support his claim of error. He urges that this is an accurate statement of the law; that this court has approved of a "distinguishing" instruction when the probability of confusing parties is high; that it is critical where the probability of prejudice is as high as it is here. We find none of these points persuasive.

---

of evidence shall be governed by these rules, or in the absence of rule, by the principles of common law as they may be interpreted by the courts of the state in the light of reason and experience. In the absence of rule, the evidence shall be presented according to the most convenient method prescribed by common law principles, and the principle which *favors the reception of the evidence* shall govern. The competency and privileges of witnesses shall be governed by these rules, or in the absence of rule, by common law principles." (emphasis added)

17. *See e. g., Jakoski v. Holland*, 520 P.2d 569, 573–75 (Alaska 1974); *Howard v. State*,

491 P.2d 154 (Alaska 1971); *Veal v. Newlin, Inc.*, 367 P.2d 155 (Alaska 1961).

18. *See e. g., Davis v. Chism*, 513 P.2d 475 (Alaska 1973); *Bakken v. State*, 489 P.2d 120 (Alaska 1971).

19. *Eubanks v. State*, 516 P.2d 726 (Alaska 1973).

20. *See, e. g., Stickel v. San Diego Electric Ry. Co.*, 32 Cal.2d 157, 195 P.2d 416 (1948); *Fugate v. Sears, Roebuck & Co.*, 12 Ill. App.3d 656, 299 N.E.2d 108 (1973); *Warren v. Hynes*, 4 Wash.2d 128, 102 P.2d. 691 (1940).

21. *Compare Rose v. B. L. Cartage Company*, 110 Ill.App.2d 260, 249 N.E.2d 199 (1969).

Poulin asserts that the instruction is an accurate statement of the law, citing Special Order No. 72 of the Superior Court, State of Alaska, Third Judicial District, October 31, 1972. Special Order No. 72 is addressed solely to settlement agreements involving minors. Furthermore, even under this order damages do not go to the "sole and exclusive benefit" of the child but may be reached to pay attorney's fees. However, the order does suggest that the funds are not for the benefit of the parents.

Appellant next claims that *Aydlett v. Haines,* 511 P.2d 1311, 1315 n. 8 (Alaska 1973), recognizes situations where confusion amongst family members requires that the real party in interest be made clear to the jury. The *Aydlett* case concerned intra-family litigation. The portion of the opinion and the facts thereof are so inapposite to the present case that citation of this case is unpersuasive. Furthermore, numerous instructions to the jury suggest, albeit indirectly, that Courtney, not her parents, is to receive the benefit of the award.[22]

Poulin concludes by urging that the prejudice in this case makes the rejection of the instruction reversible error. Since we have held that the contested admissions were harmless error, we do not agree.

In support of his motions for a judgment notwithstanding the verdict and a new trial Poulin submitted affidavits from six jurors. Appellee moved, with supporting authority, that these affidavits be stricken. Apparently this was done. Poulin now contends that it was reversible error for the judge to have refused to consider the affidavits.

At the outset it should be noted that neither side cites any part of the record indicating that the judge "refused to consider" the affidavits. Since Alaska, like virtually all states, recognizes that there may be juror misconduct of sufficient magnitude to warrant reversal,[23] it would be improper for a judge to refuse to read the affidavits.[24] However, appellant appears to have equated the word "consider" with the phrase "rule in plaintiff's favor." That verbal equation is incorrect. It is our conclusion, based on the language in the order denying the judgment notwithstanding the verdict and new trial,[25] that the trial judge did "consider" the affidavits, but found them lacking in content sufficient to affect the verdict. We now turn to the merits of that conclusion.

Both sides recognize the established and general rule which holds that jurors normally cannot impeach their own verdict. But appellant argues that these affidavits fit within an exception to the general rule, which holds that juror affidavits may be used to impeach a verdict where the affidavits show a bias or prejudice which was falsely denied during voir dire. Appellant further contends that these affidavits reflect the type of jury misconduct which many courts have been willing to censure by requiring a new trial. Neither proposition is supportable on the facts of this case.

None of the six affidavits in the present case suggest any juror bias, for or against either side, at the time of voir dire. The fact that a juror may develop a like or dislike for one side during trial and that this in turn may affect the way that juror votes in the jury room, is a fact which "in-

---

22. *See* Instructions 10, 21, 25A, 26, 27, 28, 29 and 30.

23. *See West v. State,* 409 P.2d 847, 852 (Alaska 1966).

24. *Compare Womble v. J. C. Penney Co.,* 47 F.R.D. 350 (E.D.Tenn.1969), *aff'd* 431 F.2d 985 (6th Cir. 1970), which suggests that in that district *any* affidavit would be improper unless the judge's consent were obtained first.

25. "Plaintiff's motions for judgment notwithstanding the verdict and for new trial, the grounds asserted therefore, and the memoranda and affidavits submitted in support and opposition to the motions have been fully examined and considered."

heres in the verdict." The United States Supreme Court has long recognized the folly and chaos which would result from reversing verdicts for that reason.[26]

Appellant cites a number of cases from sister states which, he claims, support his arguments. We have reviewed these cases and are unpersuaded. Overt juror misconduct[27] or concealment of bias during voir dire,[28] existed in several cases which appellant relies on. No such impropriety exists here.[29] The case which is most supportive of appellant's claim, *Stepp v. Texas & P. Ry. Co.*, 20 S.W.2d 324 (Tex.Civ. App.1929), has never been cited for the proposition here in issue, and appears to contravene other established case law in Texas.[30]

Alaska case law suggests that only serious juror misconduct should be grounds for upsetting a jury verdict. Prior to statehood the Ninth Circuit ruled that juror statements concerning "expressions, arguments, motives and beliefs" should be rejected in the absence of special statutes. *Northern Pacific Ry. Co. v. Mely*, 219 F.2d 199, 201 n. 3 (9th Cir. 1954). The touchstone case in which this court has addressed the issue is *West v. State*, 409 P.2d 847, 852 (Alaska 1966), where we held that only evidence which "clearly establishes a serious violation of the juror's duty" should be sufficient to impeach a verdict. The evidence in this case does not reveal the type of juror behavior which would warrant a new trial.[31]

Poulin argues that the trial court erred in rejecting all evidence relating to insurance.

At a hearing concerning certain pre-trial motions, the court ruled favorably on a defense motion to preclude plaintiff from referring to insurance without first obtaining the court's approval. Appellant in effect contends that this ruling prejudiced him by requiring the jury to speculate on Dr. Zartman's ability to pay. He bolsters this assertion with juror affidavits, previously discussed, and a note which the jurors sent to the judge asking if they could find liability without awarding damages.

Summarily, appellant seems to argue that the absence of proof of insurance left the jurors free to reason that ·Dr. Zartman lacked insurance. This, in turn, allegedly created a bias in favor of the defendant, particularly since the requested verdict was large and state aid for the plaintiff was a possibility. Under facts such as these, appellant argues, a blanket ruling precluding any reference to insurance, even on voir dire, offers a larger prejudicial stumbling block to plaintiff than admission, with a warning instruction, would present to defendant.

However, the court's order does not appear to have precluded reference to insurance absolutely, but rather required appellant to approach the court for approval before embarking on any particular line of questioning concerning insurance. Appellant has referred to no part of the tran-

26. *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) ; *Stein v. New York*, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (dictum).

27. *See Goff v. Kinzle*, 148 Mont. 61, 417 P.2d 105 (1966) ; *Hinton v. Gallagher*, 190 Va. 421, 57 S.E.2d 131 (1950) ; *Gardner v. Malone*, 60 Wash.2d 836, 376 P.2d 651 (1962).

28. *Shipley v. Permanente Hospital*, 127 Cal. App.2d 417, 274 P.2d 53 (1954).

29. Reduced to their essence, the affidavits in the present case state that the jury would have rendered a verdict for Poulin (at one point the vote was allegedly 11–1 finding Dr. Zartman negligent), but for the fact that the jury was uncertain as to whether they could award less damages than the amount prayed for, disliked the parents, felt that Courtney would be adequately provided for by state aid, and did not want the lawyers and parents to be the primary beneficiaries of the award.

30. *See, e. g., Hogg v. Washington National Insurance Co.*, 503 S.W.2d 325, 330 (Tex. Civ.App.1973).

31. *See also Kimble v. State*, 539 P.2d 73 (Alaska 1975) ; *Martinez v. Bullock*, 535 P.2d 1200 (Alaska 1975) ; *Gafford v. State*, 440 P.2d 405 (Alaska 1968) ; *West v. State*, 409 P.2d 847, 852 (Alaska 1966).

script suggesting that he even attempted to raise the issue at trial.

Despite this unfavorable fact setting, appellant urges us to modify a rule that has been endorsed by virtually every authority,[32] which has considered the issue. Stated simply, the general rule is that evidence of insurance is precluded in negligence cases. The reason for the rule is either irrelevance or undue prejudice.[33] There are certain recognized exceptions to the rule,[34] but none seem to apply here.

Appellant, relying heavily on Professor McCormick's treatise, argues for a more "flexible" rule in which speculation would be dampened by allowing proof of insurance, followed by a cautionary instruction requiring the jury to disregard it. While many have recoiled from this position, the proposal's most appealing quality is its potential for permanently removing the insurance issue from the jury's mind. Unfortunately, authority for appellant's view seems to be limited to McCormick.

■ In Alaska the issue is one of first impression.[35] Case law in this area certainly leaves a trial court free to adopt McCormick's view should it choose to do so.[36] But the novelty of appellant's position, in light of the complexity of this case and appellant's failure to actively pursue the issue at trial, causes us to conclude that the trial court's order did not constitute reversible error.

## IV. STANDARD OF CARE

The appellate points, relating to the appropriate medical standard of care with which Dr. Zartman was expected to comply, can be subdivided into three categoies: the role of medical textbooks in establishing the proper standard of care; specific instructions concerning the standard of care; sufficiency of the evidence in view of the standard of care.

### (a) *Textbooks*

Appellant argues that the trial court erred in refusing to admit certain medical treatises to prove substantive propositions, and that the court further erred in instructing the jury to use the medical textbooks for impeachment and not as substantive evidence.

At trial appellant offered a number of medical treatises for the substantive content they contained. The trial judge considered briefs and oral argument on the issue and concluded that these works should not be allowed as direct evidence of the statements contained therein. Although neither side has cited to the transcript, apparently many, if not all, of these medical texts were used during cross-examination by plaintiff. This is asserted in appellee's brief and can be inferred from the trial court's limiting instruction # 9A, which warned the jury not to consider the medical texts used on cross-examination as evidence of the truth of the assertions they contained.

32. *See* Annot., 4 A.L.R.2d 761, 767–773 (1949), Later Case Service 489–539 (1971), 31–34 (Supp.1974).

33. C. McCormick, *Evidence* § 201, at 479–83 (2d ed. 1972).

34. *Id.*

35. The cases which the parties cited are distinguishable as follows: *Aydlett v. Haines,* 511 P.2d 1311 (Alaska 1973), raised the issue of insurance in dictum and in the context of a discussion on the "collateral source" rule; *Ridgeway v. North Star Terminal & Stevedoring Co.,* 378 P.2d 647 (Alaska 1963), also concerned the "collateral source" rule;

*Mallonee v. Finch,* 413 P.2d 159 (Alaska 1966), upheld the trial court's exclusion of an opponent's admission which was inextricably bound with references to insurance. This court concluded, *inter alia,* that the exclusion was harmless. In *Bertram v. Harris,* 423 P.2d 909 (Alaska 1967), where the trial court did what appellant seems to urge, i. e., cautioned the jury to disregard testimony which had been elicited on insurance, this court affirmed.

36. McCormick himself notes that "the trial judge's discretionary power could still be invoked" if prejudice outweighed the need. McCormick, *Evidence* § 201, at 480 (2d ed. 1972).

Appellant claims that the ruling and the limiting instruction constitutes reversible error. He argues that the treatises were relevant on both the issue of proper oxygen treatment for premature babies and the issue of informed consent. The relevance of the materials was not contested by appellee either at trial or in his brief. Instead, appellee claims that the treatises constitute hearsay which fits within no generally recognized exception to the rule. Appellant urges us to recognize an exception which many legal scholars endorse[37] and which a few states have adopted.[38]

Hearsay traditionally has been rejected for the primary reasons that it is thought to be both untrustworthy and unnecessary. Usually, if a particular type of hearsay is determined to be highly trustworthy, e. g., a declaration against pecuniary interest, or highly necessary, e. g., a dying declaration, an exception to the hearsay rule allows the evidence to be admitted.

Historically, medical treaties were thought to be either untrustworthy or insufficiently necessary to warrant their admission as direct evidence. Those claiming that such treatises are untrustworthy bolster their contention with the following classic arguments:

(1) The author is not under oath, nor is he present for the jury to observe his demeanor.

(2) The crucial adversarial tactic of cross-examination, with its virtues for uncovering the truth, is impossible.

(3) Medical science is of such a rapidly changing nature that the printed work may be obsolescent.

The opponents of medical treatises go on to urge that the treatises are not necessary, at least when experts can be obtained by the proponents of the textbooks. In some states the doctrine of *res ipsa loquitur* is claimed to obviate the need for medical treatises to prove breach of the standard of due care.[39]

Those who favor the admission of medical treatises counter most of these arguments and in doing so justify medical treatises as both trustworthy and necessary. They first contend that textbooks are trustworthy because:

(1) An oath is no guarantee of veracity (nor is demeanor). Furthermore, logic would suggest that one is less motivated to distort the truth in the uncontentious context of scholarly research than in the partisan heat of a courtroom trial.

(2) The prime virtue of cross-examination rests in its capacity for "filling out" testimony. This will not be lost since other treatises and experts can be used to complete the picture. In any event, cross-examination is frequently sacrificed in the face of sufficient need, e. g., dying declarations.

(3) The assertion that the rapidly changing nature of medicine makes it an improper subject for printed testimony is rejected as contrary to fact.

The proponents then claim a pressing need for this type of evidence. Two reasons usually are given:

(1) The costs of expert legal advice would be greatly reduced;

---

37. *See e. g.*, C. McCormick, Evidence § 296, at 621 (1954); VI J. Wigmore, Evidence § 1692 (3rd ed. 1940). *See also*, Note, *Admissibility of Medical Books in Iowa: Expert Witnesses in Hardback Covers*, 56 Iowa L. Rev. 1028, 1043 (1971); Note, *Medical Treatises as Evidence in Court and in Workmen's Compensation Proceedings*, 52 Cornell L.Rev. 316, 322–23 (1967); Comment, *Learned Treatises as Direct Evidence: The Alabama Experience*, 1967 Duke L.J. 1169 (1967); *Recent Developments*, 66 Mich.L. Rev. 183, 191–92 (1967).

38. Alabama allows medical treatises as the result of case law. Kansas, Massachusetts and Nevada have allowed this by statute. The Canal Zone and the Virgin Islands also have enacted statutes which adopt a position similar to appellant's. *See* VI J. Wigmore, Evidence § 1693 nn. 1 & 2 (3rd ed. 1940 & Supp.).

39. Alaska has no such doctrine and, in fact, AS 09.55.550 specifically rules out any presumptions of negligence in malpractice cases.

(2) The possibility of a "conspiracy of silence" by doctors protecting their own kind would be lessened.

While the arguments supporting both positions are intriguing, we find it unnecessary to resolve the issue at this time. In the case at bar appellant was able to obtain outstanding experts to testify on his behalf. Furthermore, he did make use of the treatises on cross-examination. Thus it is hard to see how appellant was harmed by the ruling and instruction. We therefore concluded that any claimed error which the trial court may have committed was harmless.

Appellant also argues that the treatises were not offered for the truth asserted therein, but to show what Dr. Zartman knew or should have known about oxygen therapy. This point was also made at trial. In the case of multiple-use testimony, admission always rests in the sound discretion of the trial judge. We do not understand what relevance Dr. Zartman's knowledge of existing medical techniques has to the issue of negligence or informed consent. Appellant cited no malpractice cases suggesting that knowledge is an operative element in this type of suit. Appellee cites *Naccarato v. Grob*, 12 Mich.App. 130, 162 N.W.2d 305 (1968), which expressly holds that such information is *not* relevant. In any event, Dr. Zartman's trial position expressly rejected "titration" as being a "dangerous" technique. This hardly suggests lack of awareness of the method on his part. Therefore, any error in this regard was harmless.

(b) *Instructions Concerning Standard of Care*

Alaska's normal standard of care for physicians is set forth in AS 09.55.540, which provides as follows:

"(a) In a malpractice action based on the negligence of a *physician* licensed under AS 08.64, or a dentist licensed under AS 08.36, the plaintiff shall have the burden of proving

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing the *same specialty in similar communities* to that in which the defendant practices;

(2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

(b) In malpractice actions there shall be no presumption of negligence on the part of the defendant." (§ 1 ch. 49 SLA 1967) (emphasis added)

Appellant requested three types of instructions concerning the medical standard of care and each type was rejected. The first type, consisting of two separate instructions, suggested that doctors with "superior knowledge" or certified by a National Board be held to a higher standard than the "similar communities" test set out by statute.[40] The second type, based on the facts of this case, in essence stated that Dr. Zartman's failure to see that his orders were being properly administered breached the "accepted standards of care." The third type simply held that any special susceptibilities which Courtney Poulin had did not relieve the doctor of liability for any negligence on his part. As already noted, each instruction was rejected and appellant argues that this constitutes reversible error.

Dr. Zartman was trained in a large, prestigious medical school in Chicago; he is licensed to practice medicine in five states;[41] and he has been certified by the American Board of Pediatrics. Appellant

40. See AS 09.55.540.

41. These are Massachusetts, New York, Illinois, California and Alaska.

argues that doctors with such "superior knowledge" or national board certification should be held to a higher standard than the "similar communities" test of AS 09.-55.540. The trial judge rejected appellant's proposed instruction #15 (on superior knowledge),[42] and supplemental instruction #7 (on national certification),[43] in favor of an instruction embodying the essential language of the statute. Appellant claims that this constitutes reversible error.

We have reviewed the law on this subject [44] and find that the various states have adopted a myriad of positions, from New Mexico,[45] which applies a strict locality test,[46] to Michigan,[47] which feels that geographic locale is irrelevant in cases involving specialists. The majority of states have adopted a modified locality rule such as the "similar communities" test contained in AS 09.55.540.

Appellant contends that AS 09.55.540 sets a "minimum standard" and that those doctors with special skills must be held to account for those special skills. He cites Professor Prosser as supporting that proposition at common law. Prosser does state that "a physician who is possessed of unusual skill or knowledge must use care which is reasonable in the light of his special ability and information" [48] but he adds that "the care required is still only the ordinary care of a reasonable man assuming he has such special knowledge." [49] The language of AS 09.55.540 takes into account this "objective" higher standard for specialists with the proviso that the standard be based on "physicians . . . practicing the same *specialty* in similar communities." (emphasis added)

Appellant also argues that nationally certified specialists should be held to a nation-

---

42. Requested Instruction # 15 provided as follows:
 "A *physician* may be possessed *with a greater degree of skill*, knowledge or intelligence than other physicians practicing in the same specialty in similar communities. In such a case the physician *is required to use whatever superior knowledge*, skill and intelligence *he has* and the failure to do so will render him liable for injury to the patient." (emphasis added)

43. Requested Instruction # 7 provided as follows:
 "You are instructed that the degree of knowledge or skill exercised by *pediatricians certified* as such *by the American Academy of Pediatrics is not subject to variation on a geographical basis* in this country. Therefore, on the question of the defendant's skill or knowledge, no allowance should be made for the type of community in which he carries on his practice." (emphasis added)

44. *See generally*, Vol. 16 No. 3 Ass'n of Trial Lawyers of America, *News Letter* 107 (April 1973) ; D. Louisell & H. Williams, *Medical Malpractice* ¶ 8.06 (1973 & 1973 Supp.) ; Prosser, *Torts* § 32, 161 (4th ed. 1971) ; Annot., 21 A.L.R.3d 953 (1968 & 1973 Supp.) ; Note, *An Evaluation of Changes in Medical Standard of Care*, 23 Vand.L.Rev. 729 (1970) ; Waltz, *The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation*, 18 DePaul L.Rev. 408 (1969) ; Perdue, *The Law of Texas Medical Malprac-*

*tice: Standard of Care*, 11 Houston L.Rev. 22 (1973) ; Kroll, *The Etiology, Pulse and Prognosis of Medical Malpractice*, 8 Suffolk L.Rev. 598 (1974) ; King & Coe, *The Wisdom of the Strict Locality Rule*, 3 Baltimore L. Rev. 221 (1974).

45. *Gandara v. Wilson*, 85 N.M. 161, 509 P.2d 1356 (1973).

46. Basically the states have taken one of three positions on this issue. The oldest view was the strict locality rule. Under that rule the doctor was held to the standards of the reasonable doctor in that locality only. This view presents many problems, e. g., the town with only one doctor, and the majority of states appear to have adopted the "similar communities" test. An increasing number of states have moved beyond that and have abandoned or reduced the role of geographic locality altogether. Appellant cites several of these cases in his brief.

47. *Naccarato v. Grob*, 384 Mich. 248, 180 N.W.2d 788, 791 (1970).

48. Massachusetts, New Jersey, Iowa, West Virginia, Arizona and Washington. Two states not cited by appellant also appear to endorse his viewpoint. *See, e. g., Naccarato v. Grob*, 384 Mich. 248, 180 N.W.2d 788, 791 (1970), and *Karp v. Cooley*, 493 F.2d 408 (5th Cir. 1974).

49 W. Prosser, Torts § 32, at 161 (4th ed. 1971).

al, rather than a geographically localized standard of care. He cites opinions from six states [50] which allegedly support his position. Probably the strongest cases Poulin cites are *Carbone v. Warburton*, 22 N.J.Super. 5, 94 A.2d 680, 683 (1953); *Kronke v. Danielson*, 108 Ariz. 400, 499 P.2d 156 (1972); and *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973 (1967). Those courts clearly endorsed a general standard for specialists. Both *Brune v. Belinkoff*, 354 Mass. 102, 235 N.E.2d 793 (1968) and *McGulpen v. Bessmer*, 241 Iowa 1119, 43 N.W.2d 121 (1950), also endorse a general, non-geographical standard, but both courts were impressed by the easy accessibility to major medical centers [51] which the doctors had. *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967), arguably supports a "similar communities" test since the court merely states that it concurs with the "liberalization" of the locality rule, while it does "not . . . abrogate such rule in all instances," in qualifying an expert who had never been to the locality in question. 158 S.E.2d at 168.

Appellant's argument in this regard is a strong one. But we must reject his claim of error. There are certain initial limits placed upon us in the interpretation of statutes. This was dwelt upon in *Alaska Mines & Minerals, Inc. v. Alaska Indust. Bd.*, 354 P.2d 376, 379 (Alaska 1960). There we stated that if a statute is unambiguous and clearly expresses the intent of the legislature, it should not be modified or extended by judicial construction. This was elaborated on in *State v. City of Anchorage*, 513 P.2d 1104, 1109 (Alaska 1973), where we stated that the legislative "language [must be] so unambiguous as to leave no doubt as to the meaning or scope of the result dictated." The language of AS 09.55.540 is so clear and unambiguous that we are foreclosed from broadening the standard contained therein through judicial construction.

We now turn to the next claim of error. Appellant submitted two instructions stating in essence that lack of proper supervision could constitute a breach of a doctor's standard of care.[52] The trial judge rejected both instructions and Poulin claims error, relying exclusively on *Toth v. Community Hospital*, 22 N.Y.2d 255, 292 N.Y.S. 2d 440, 239 N.E.2d 368 (1968).

Appellant's reliance on the *Toth* case is very understandable. Not only are the facts of that case quite similar to the facts here, but the instruction there in issue was an obvious pattern for Poulin's supplemental instruction #8. In *Toth* the doctor had ordered six liters of oxygen for twelve hours, then a reduction to four liters. In fact, the oxygen was not reduced for nearly 30 days. The baby developed RLF, and the parents sued the doctor. The trial judge refused plaintiff's instruction on his duty of supervision, and the jury found in favor of defendant. On appeal New York's highest court reversed because of the trial court's refusal to give the instruction.

In the present case it appears to be undisputed that oxygen should be administered at the lowest possible level that will relieve the symptoms for which it is given. Dr. Zartman ordered oxygen to be administered to Courtney Poulin in an amount "necessary to keep *pink*." A number of defense witnesses, including Dr. Zartman himself, acknowledged that some form of periodic down-testing of oxygen was required, although none was expressly ordered. The nurses' records reflect that a liter flow of 4 was reached at 6:30 p. m. on February 13, 1968, and it remained at that flow level until 1:15 p. m. on February 15, 1968. During this 43¾ hour period,

---

50. *Id.* at n. 30.

51. The *Brune* court points out that New Bedford, scene of the alleged malpractice, was a mere 50 miles from Boston. 235 N.E.2d at 798. The *McGulpen* court noted that Daven-

port, Iowa, is only 3 to 4 car hours from Chicago. 43 N.W.2d at 127.

52. Instruction 18 and supplemental instruction 8.

Dr. Zartman did not attend the baby at all. Doctors Peterson and Tower did visit the child at 2:00–3:00 p. m. on February 14, 1968, but *no reduction of liter flow was ordered*, despite an apparent absence of cyanosis. When Dr. Zartman again reexamined the child on February 15, 1968, he ordered her to be weaned from all oxygen.

■ Poulin submitted two instructions concerning Zartman's duty of supervision and both were rejected. Proposed instruction no. 18 stated:

"If a physician is aware of a risk in the therapy which he orders and relies upon the nursing staff to follow a procedure to minimize that risk, he will be liable for injury resulting to the patient for the nurses failure to do so, if the nurses do not follow the procedure anticipated and he has an opportunity to discover the deviation from the procedure and he fails to do so."

In our opinion, the trial court's refusal to give proposed instruction no. 18 was not error, since we find that the instruction is incomplete, if not wholly lacking, as to the crucial element of proximate cause, which is essential to any liability predicated on negligence.

However, Poulin also submitted proposed instruction no. 8, which provided:

"If you find that Dr. Zartman believed that continuous administration of oxygen to Courtney Poulin in an amount greater than that necessary to maintain her pink color would be harmful to her and that the dosage was continued in amounts higher than that necessary to maintain her pink color and you further find that the doctor failed to ascertain that the nurses were *not* periodically testing the oxygen level, as he anticipated, to determine the minimum level of oxygen then you should find such failure by him not to be in accord with the accepted standards of care and diligence required of physicians and if such failure on his part contributed to cause or to aggravate the injury to Courtney Poulin,

you should return a verdict against the doctor."

This instruction also was rejected, and no instruction by the trial court expressly and specifically called the jury's attention to Poulin's contention that Zartman's lack of supervision may have proximately caused Courtney's blindness, and therefore constituted medical malpractice.

We are gravely concerned that no instruction regarding supervision was given. Dr. Zartman realized that excessive oxygen was dangerous, but he relied on the nursing staff, without the benefit of an explicit order, to periodically reduce the oxygen if the baby remained pink. He had the opportunity during a 43¾ hour period to ascertain whether this safety procedure was in fact being carried out, but he did not visit the baby during that time. Dr. Zartman had no personal knowledge of the training and background of the nurses on duty during this critical period, and there is also no indication that he asked the doctors who "filled-in" for him to determine whether the nurses were reducing the oxygen flow, as may have been appropriate.

■ We are not stating or implying that the omissions enumerated in the preceding paragraph constitute medical negligence. Such a conclusion is within the purview of a jury to determine. However, we believe that in a lengthy and complex case involving two theories of liability which are closely intertwined, yet wholly separate and distinct, it is incumbent upon the trial judge to make clear to the jury, in some manner, that the law recognizes and acknowledges the distinctions in the theories and that the jury must do likewise in rendering its verdict.

■ In this case the questions about proper therapeutic procedure, and the proper execution of a particular therapeutic procedure, are closely related. Poulin made two separate requests for instructions which would have highlighted the distinction. While the trial court was not re-

quired to give either instruction verbatim, we hold that the failure to give any instruction on the issue of medical supervision constitutes error.

Appellee argues that the trial court instructed the jury generally on negligence. So did the trial court in *Toth v. Community Hospital, supra*. But appellee distinguishes the two cases by claiming that in *Toth* the issue was withheld from the jury, whereas here Poulin argued it to the jury. This argument certainly would not have persuaded the *Toth* court. There, although plaintiff had not pleaded or argued the "supervision" theory,[53] the court, with one member dissenting, found error. The dissenting judge refused to join the majority because supervision had not been a theory of the case. Here lack of supervision was an obvious theory and the *Toth* court surely would have found this to be error.

Appellee also argues that this was a "specific" instruction of the nature proscribed by this court in *Clary v. Fifth Ave. Chrysler Center, Inc.*, 454 P.2d 244 (Alaska 1969). It is true that we favor general instructions over argumentative, pro and con instructions. Nothing in our present holding contradicts that maxim. However, the ruling in *Clary* resulted from an instruction requesting the recitation of sixteen separate duties. The case at bar is much less extreme. In addition, the facts in this case gave rise to two distinct theories which a jury might tend to combine in rendering their verdict. Under the circumstances we hold that the failure to give any instruction highlighting the duty of supervision was reversible error.

Appellant requested supplemental instruction # 3, which reads as follows:

"You are instructed that the fact that the plaintiff was unusually susceptible to injury because of her prematurity does not relieve the defendant from liability for any injuries, disabilities, or damages resulting to the plaintiff proximately caused or contributed to by the defendant's negligence or breach of his duty of disclosure."

The instruction was rejected and appellant claims this rejection as prejudicial error.

Poulin relies on pattern jury instructions in *California Jury Instructions—Civil* (Cal Jic 1959) and Alexander's *Jury Instructions in Medical Issues* (1966). He also cites three out-of-state cases which allegedly support his position. None of these authorities is persuasive.

The *Cal Jic* instruction # 14.65 (5th ed. 1969) is under the broad label of "Damages—Aggravation of Preexisting condition." Basically, it is designed to ensure that the unusually susceptible person, sometimes called the "egg-shelled" plaintiff, will receive full recovery for his injuries. Thus it goes to the question of damages once liability is established, not to the scope of duty in establishing liability in the first place. *Rubano v. Koenen*, 152 Conn. 134, 204 A.2d 407 (1964), *Sears Roebuck & Co. v. Daniels*, 299 F.2d 154 (8th Cir. 1962) and *Meeks v. Yancey*, 43 Tenn. App. 667, 311 S.W.2d 329 (1957), are also cited by appellant. They too are concerned with the so-called "egg-shelled" plaintiff. Only jury instruction # 4-23 offered by Alexander in his book entitled *Jury Instructions on Medical Issues* appears to be on point. However, the Alexander instruction, which is similar to appellant's instruction, was culled from *Lemere v. Safeway*, 102 Cal.App.2d 712, 228 P.2d 296, 303 (1951). That case also involved an "egg-shelled" plaintiff, and the appeal was based on a claim of insufficient damages at trial. The language which Alexander extracts was at the very end of a lengthy jury instruction which the appellate court approved of in affirming the verdict. Hence, none of Poulin's authority is on point in this case.

Appellee argues that evidence on Courtney's prematurity established not merely a susceptibility, but indeed a proximate cause for Courtney's injuries. This

was a central theme in Zartman's defense and certainly would appear to be a legitimate jury question.

▮ Finally, a careful reading of the instruction reveals that it states in essence that Courtney's susceptibility does not excuse Zartman's negligence. Since Zartman's negligence is the very thing in issue, the instruction is argumentative and hence improper. *Clary v. Fifth Avenue Chrysler Center, Inc., supra.* Even the Alexander instruction, which so closely parallels appellant's requested instruction, states that susceptibility does not excuse negligence "if any there was." [54]

### (c) *Sufficiency of the Evidence*

Appellant urges that under any standard of care the evidence was such that the jury's verdict was wrong and Judge Buckalew's denial of a judgment notwithstanding the verdict or, at least, a new trial was reversible error. The record does not support this contention.

▮ Appellant correctly cites the test for reviewing a denial of a judgment notwithstanding the verdict. In essence, we must review the record in a light most favorable to appellee, and reverse only if reasonable and fair-minded persons would invariably have found for appellant. *City of Fairbanks v. Nesbett,* 432 P.2d 607, 609–610 (Alaska 1967).

▮ Appellee offers the proper test for the review of a denial of a new trial for alleged insufficiency of evidence. That standard allows reversal only if we determine that the trial judge abused his sound discretion. In this context, such abuse will be found only if evidence supporting the verdict was completely lacking or so slight and unconvincing as to be plainly unreasonable and unjust. *Ahlstrom v. Cummings,* 388 P.2d 261, 262 (Alaska 1964). Thus only in the absence of an evidentiary basis or a miscarriage of justice will we grant a new trial on the grounds

of jury error. *Mertz v. J. M. Covington Corp.,* 470 P.2d 532, 536 (Alaska 1970).

▮ Our review of the record convinces us that no error was committed in the trial court's denial of a judgment notwithstanding the verdict or new trial. The evidence regarding the proper method of administering oxygen and the need for administering a bilirubin test was in conflict with substantial testimony supporting the approach which Dr. Zartman took. With regard to adequate supervision, we are disinclined to rule on this issue as a matter of law, since we believe that the facts established on this record would support a jury verdict for either side. On the issue of informed consent, which the next section of this opinion addresses in detail, we hold that Poulin's failure to present adequate evidence to prove proximate cause renders unassailable the jury's verdict on this issue.

## V. INFORMED CONSENT

Appellant raises issues concerning informed consent under two separate rubrics. First, he contends that the instructions concerning the basis for liability precluded the jury from ever reaching the issue of informed consent. Second, he contends that the weight of the evidence presented on informed consent, when coupled with the modern version of that doctrine, made a judgment notwithstanding the verdict or new trial imperative. Therefore, it is urged that the denial of the motion for a judgment notwithstanding the verdict or new trial is reversible error.

Appellant in essence claims that the "informed consent" doctrine is not a subset of the generic concept of "medical malpractice." Judge Buckalew's jury instruction # 12 mandated, *inter alia,* a defense verdict if the jury found no medical malpractice. Appellant claims that this prevented the jury from ever reaching the issue of informed consent and thus constituted reversible error.

54. Alexander, *Jury Instructions on Medical Issues,* 4–23, at 307 (1966).

Appellant's argument on this point is not persuasive. None of the authority which he cites holds that "informed consent" is not an issue in medical malpractice. And, as one court has noted:

"The . . . issue for the jury to determine should be whether . . . treatment was given with the informed consent of the patient, and if it was not, the physician . . . is *guilty of malpractice* no matter how skillfully the treatment may have been administered . . . ." *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, 1107 (1960) (emphasis added).[55]

█ Even if the semantic distinction between informed consent and malpractice were not as infirm as it appears to be, appellant's position would still be untenable. He cites several cases holding that faulty formulary instructions cannot be corrected by other instructions. But he fails to cite

the numerous Alaska cases which hold jury instructions, when read in their entirety, to be non-reversible. *See ERA Helicopters, Inc. v. Digicon Alaska, Inc.*, 518 P.2d 1057, 1059 (Alaska 1974); *Breitkreutz v. Baker*, 514 P.2d 17, 27 (Alaska 1973); *National Bank of Alaska v. McHugh*, 416 P.2d 239 (Alaska 1966); *Mitchell v. Knight*, 394 P.2d 892 (Alaska 1964). In the case at bar the superior court specifically gave two separate instructions on informed consent. Even more significant is the particular language in the very instruction about which appellant complains.[56] In the first part of the instruction the judge summarized the issues in this case. He stated that plaintiff had alleged negligent medical practice in several respects including the failure to obtain informed consent. Thus, even if informed consent gives rise to a different type of liability than malpractice, the instuction rendered that difference immaterial. No harm was done to appellant, and

---

55. *See also Shetter v. Rochell*, 2 Ariz.App. 358, 409 P.2d 74, 83 (1965); Comment, *Valid Consent to Medical Treatment: Need the Patient Know?*, 4 Duq.L.Rev. 450, 453 (1966).

56. Instruction No. 12 reads as follows:
"The plaintiff claims that defendant Zartman failed to comply with the proper standard of medical practice and was therefore negligent in one or more of the following respects:
1. That as a result of administration of oxygen under the direction and supervision of the defendant the plaintiff developed retrolental fibroplasia causing her to become blind.
2. The defendant failed to perform all indicated blood tests which the clinical signs of the plaintiff required and the failure to so act resulted in damage to the plaintiff's central nervous system.
3. The administration of oxygen and/or the failure to obtain appropriate blood tests for the plaintiff was done without the consent of Wilfred Poulin and/or Patricia Poulin, the parents of the minor plaintiff.
Plaintiff also claims that the defendant's conduct was the proximate cause of the injuries to Courtney Poulin.
Defendant Zartman denies these claims or allegations.
The foregoing is merely a summary of the claims of the parties, and has been given to

you solely to aid you in understanding the issues. It is for you to decide, from all of the evidence in the case, whether any of these claims have been proven.
Consequently, the issues to be determined by you in this case are these:
First: Is the defendant liable for medical malpractice? If your answer to that question is "no", you will return a verdict for the defendant. If your answer is "yes", you will have a second issue to determine, namely: Was such malpractice a proximate cause of any injury to the plaintiff?
If your answer to that question is "no", plaintiff is not entitled to recover, but if your answer to "yes", you will then find what damage plaintiff thus has been caused to suffer, and you will return a verdict in her favor for the amount thereof."
First: Is the defendant liable for medical malpractice? If your answer to that question is "no", you will return a verdict for the defendant. If your answer is "yes", you will have a second issue to determine, namely: Was such malpractice a proximate cause of any injury to the plaintiff?
If your answer to that question is "no", plaintiff is not entitled to recover, but if your answer is "yes", you will then find what damage plaintiff thus has been caused to suffer, and you will return a verdict in her favor for the amount thereof."

his claim of error on this point must be rejected.

█ The next question raised by appellant concerns the proper standards and elements of "informed consent." It is noteworthy that appellant does not claim any error in instructions on this point.[57]

Appellant correctly states that the issue of "informed consent" is one of first impression in Alaska. The only law expounded in *Patrick v. Sedwick*, 391 P.2d 453 (Alaska 1964), is the seemingly undisputed principle[58] that proximate cause must be shown in order to recover for lack of informed consent. This requires evidence that "plaintiff would have declined the [procedure]" if adequately informed. *Patrick v. Sedwick, supra*, at 458.

Appellant sets forth Dr. Zartman's testimony at his deposition. In that deposition, Zartman stated, *inter alia,*

" . . . I told [the father] . . . that in order to save the baby's life we would have to use oxygen, and I said it was actually a risk, that the baby might be blind, but . . . it was . . . academic . . . as to whether one had a live, blind baby or a baby who . . . was dead, and the father agreed completely with my decision . . . . ."

█ At trial, Poulin denied that Zartman had informed him of the risk of blindness. This conflicting testimony presented a valid jury question which cannot be overturned on appeal. But appellant urges that even if Zartman did advise the father of the risk of blindness, the failure to discuss the availability of an "alternative therapy", i.e., titration, was a prima facie material omission justifying a judgment notwithstanding the verdict or new trial.

█ We need not reach the difficult and complex questions which the briefs raise regarding the duty and scope of disclosure required by the informed consent doctrine. This is because the evidence at trial failed to establish the proximate cause element which is required in any claim based upon lack of informed consent. Specifically, Poulin was asked whether he would have consented to the procedure of titration had he known about it. Although Poulin indicated that he would have consented to the administration of the alternative procedure, he conceivably could have consented to both procedures, leaving the final choice to the doctor. The record fails to establish that, had he known of the alternative, he would have declined the procedure which was employed. *Patrick v. Sedwick, supra*, 391 P.2d at 458. Therefore, appellant's claim of error is overruled, as proximate causation was not proven at trial.

## VI. CONCLUSION

In summary we conclude that, with one exception, the trial court's rulings were either not erroneous or were harmless error. However, the failure to give any instruction to clarify and distinguish the duty of supervision from the duties regarding proper methodology and informed consent was reversible error.

█ It is the recognized rule that when an issue requiring reversal is fairly separable from the other issues involved in the case, we may grant a partial new trial, setting aside only so much of the judgment as is affected by error. The balance of the judgment may remain intact. *Corridon v. City of Bayonne*, 129 N.J.Super. 393, 324 A.2d 42, 45 (1974); *Terminal Const. Corp. v. Bergen County Hackensack River*

---

57. The trial court's instruction # 22 stated in essence that there must be a reasonable disclosure of all significant facts necessary for an intelligent and informed consent. Such disclosure should include available choices of treatment and material risks inherent in each choice. Failure to perform this disclosure

duty renders the doctor liable for injuries proximately resulting therefrom.

58. *See, e. g., Canterbury v. Spence*, 150 U.S. App.D.C. 263, 464 F.2d 772, 790 (1972); *Cobb v. Grant*, 8 Cal.3d 229, 502 P.2d 1, 11, 104 Cal.Rptr. 505 (1972).

*Sanitary Sewer Dist. Authority*, 18 N.J. 294, 113 A.2d 787, 812 (1955). Whether the issue requiring reversal is fairly separable from the other issues adjudicated in the trial court depends upon our view of the facts and circumstances of each case. *Gyerman v. United States Lines Co.*, 7 Cal.3d 488, 498 P.2d 1043, 1054, 102 Cal.Rptr. 795 (1972). We have applied these principles in other cases on appeal. *City of Fairbanks v. Nesbett*, 432 P.2d 607, 613 (Alaska 1967); *State v. Stanley*, 509 P.2d 279 (Alaska 1973).

It is noteworthy that the court in *Toth v. Community Hospital, supra*, considered the duty of supervision to be sufficiently distinct from the other malpractice questions presented there that new trial was ordered only as to the duty of supervision issue, the balance of the judgment in favor of the physician remaining intact.

 We are of the same view in the case at bar. Consequently, we hold that the issues of methodology and informed consent may not be retried, but a new trial regarding the issue of proper supervision is required. Because of our disposition of the case, we need not reach the question of costs and attorneys' fees which Dr. Zartman raises in his cross-appeal.

Affirmed in part, reversed, in part, and remanded for proceedings consistent with this opinion.

ERWIN, BOOCHEVER and BURKE, JJ., not participating.

RABINOWITZ, Chief Justice (concurring in part, dissenting in part).

I concur in the court's dispositions of the numerous and complex issues presented by this appeal with the exception of the majority's construction of AS 09.55.540.

AS 09.55.540(a) provides, in part:

In a malpractice action based on the negligence of a physician . . . the plaintiff shall have the burden of proving (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . practicing the same specialty in similar communities to that in which the defendant practices; . . .."

The relevant legislative committee report expressly states that AS 09.55.540(a) " . . . attempts to codify the law with respect to the burden of proof in medical . . . malpractice actions . . .."[1] The report makes no reference to the standard of care to which physicians are to be held. Thus, I find I am in agreement with appellant Poulin's position that this statute treats only the subject of burden of proof in malpractice litigation. Even if AS 09.55.540 is construed to embody standards of care, I think it should be read as only providing minimum standards and that a plaintiff should be able to prove, and the jury to consider, that a higher degree of actual skill and knowledge was possessed by a particular physician which in turn could result in that physician being held to a more stringent standard of care.

The crux of my disagreement with the court's opinion centers on the majority's assertion that "The language of AS 09.55.-540 takes into account this 'objective' higher standard for specialists with the proviso that the standard be based on 'physicians . . . practicing the same specialty in similar communities.'" Appellant Poulin correctly urges that doctors with special skills must be held to account for those special skills. In accord with this argument is Professor Prosser who suggests that " . . . a physician who is possessed of unusual skill or knowledge must use care which is reasonable in light of his

1. House Judiciary Committee Report on Committee Substitute for Senate Bill No. 142, amended, House Journal p. 492, March 20, 1967.

special ability and information . . . . " and adds that " . . . the care required is still only the ordinary care of a reasonable man, assuming he has such special knowledge." [2]

Given my belief that AS 09.55.540 pertains to burdens of proof in malpractice litigation, and even if AS 09.55.540 is held to establish standards of care, these standards are minimal standards, I conclude that Poulin's requested instruction pertaining to the standard of care flowing from a physician's greater degree of skill or superior knowledge should have been given.[3]

[2]. W. Prosser, Handbook of the Law of Torts (4th ed. 1961), § 32, at 161, 162, n. 30. *See also* Restatement of Torts (Second) § 289, comment (m) and § 299A, comment (d). *Cf. Gerkin v. Brown & Sehler Co.*, 177 Mich. 45, 143 N.W. 48 (1913).

[3]. This requested instruction read:

A physician may be possessed with a greater degree of skill, knowledge or intelligence than other physicians practicing in the same specialty in similar communities. In such a case the physician is required to use whatever superior knowledge, skill and intelligence he has and the failure to do so will render him liable for injury to the patient.